IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

F I L E D

04 FEB 27 PM 3: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

*P 8*

# ENTERED

**FEB 27 2004**

|  |  |
|---|---|
| CASSANDRA MCCLINTON, JOHN BESS, WOODROW BRAY, JR., CAYCE BROOKSHIRE, JEFFREY BURKHALTER, RYAN CHILDERS, WILLARD DAVIDSON, RUSSELL HARDY, CHARLOTTE HENLEY, TOM JOHNS, SEAN MALDON, CLARENCE MCKINNON, JAMES MILLS, MARCUS MOOREHEAD, DARRELL PADGETT, RODNEY RICKELS, VINCENT ROBERTSON, JOHN WALTHER, BRAD WELCH, and GREG WILSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )CIVIL ACTION NO. 01-JEO-1994-S ) |
| SOUTHERN MANAGEMENT DEVELOPMENT, INC., DAVID SHERRILL, and GERALD WILLIAMS, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

This case is before the court on the defendants' motion for summary judgment on the plaintiffs' second amended complaint.[1] (Doc. 88).[2] For the reasons set out herein, the defendants' motion is due to be granted in its entirety.

## PROCEDURAL HISTORY

This case was brought by twenty plaintiffs against their former employer, Southern Company Energy Solutions ("SCES"), and two former managers of SCES (David Sherrill and

---

[1] The plaintiffs' claims are addressed in their entirety in their Second Amended Complaint.

[2] References to "Doc. ___" are to the documents as numbered by the clerk of court in the court's record of the case.

*119*

Gerald Williams).[3]  The plaintiffs filed their first complaint on August 7, 2001.  (Doc. 1).

Thereafter, on September 4, 2001, the defendants moved for a more definite statement of the

plaintiffs' claims (doc. 5), which the court granted on September 24, 2001 (doc. 13).  The

plaintiffs then filed their Amended Complaint on October 24, 2001 (doc. 15), and their Second

Amended Complaint on January 18, 2002 (doc. 33).

The plaintiffs were all employed with SCES and assigned to provide services to an

affiliated alarm and security company, PowerCall, Inc. (hereinafter "PowerCall").  In Counts I

through VII of the Second Amended Complaint, the plaintiffs have alleged claims of breach of

contract (Counts I , II, V, and VI), fraud (Count III), and breach of fiduciary duty under state law

and ERISA (Counts IV & VII), arising out of a decision to sell the assets of PowerCall to another

alarm and security company known as Protection One, Inc. (hereinafter "Protection One" or "Pro

One").  In Counts VIII, IX, X, XI, and XII, plaintiffs Cassandra McClinton, Russell Hardy, and

Sean Maldon allege claims of race discrimination.  (Doc. 33).

On February 4, 2003, the defendants filed their motion for summary judgment as to all of

the plaintiffs' claims in their second amended complaint.  (Doc. 88).  Although the plaintiffs are

no longer represented by counsel, the motion was fully briefed before their last attorney withdrew

from representation.[4]

---

[3] Originally, this case had twenty-four plaintiffs. Jim Moore, Scott Sexton, and Charles Pittman voluntarily dismissed their claims. Tracey Isom was dismissed pursuant to a settlement agreement. (Doc. 29, 58, 59, & 65).

[4] The defendants filed their reply brief on June 6, 2003, and attorneys James A. Barnes and David Stem were allowed to withdraw as attorneys of record for the plaintiffs on June 27, 2003. (Doc. 115 & 118). Thereafter, the court stayed this action only to the extent that it did not address the merits of the pending substantive motions for a period of 120 days. (Doc. 118). As the matter is fully under submission and 120 days has expired, the motion is now ready for consideration.

# FACTS[5]

At the time of the events giving rise to this lawsuit, defendant Southern Management Development, Inc. ("SMD") was known as SCES.  SCES is a subsidiary of Southern Company, a holding company that also owns several electric utility companies including Alabama Power Company.  (Roberts Decl. at ¶ 2).[6]

The plaintiffs are former employees of SCES.  During their employment with SCES, the plaintiffs were assigned to provide services to PowerCall, another subsidiary of Southern Company that did not have any employees of its own.  PowerCall was a residential and commercial security company that operated in Alabama, Georgia, Florida, and Mississippi.  The plaintiffs worked for PowerCall in Alabama, either as salespeople, installation and service technicians, or administrative employees.  (Roberts Decl. at ¶ 4).

Defendant David Sherrill oversaw all aspects of PowerCall's operations as the PowerCall Customer Service Manager, and defendant Gerald Williams was the Area Manager for PowerCall in Alabama.  (Sherrill Decl. at ¶ 2; Roberts Decl. at ¶ 3; Sherrill Dep., p. 17).[7]

## I. PLAINTIFFS' AT-WILL EMPLOYMENT STATUS AND BENEFITS

SCES hired the plaintiffs at various times between 1997 and 2000.  Throughout the time they were employed by SCES and assigned to work for PowerCall, the plaintiffs were employed

---

[5] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  As the plaintiffs did not dispute the defendants' statement of facts and did not offer a statement of facts themselves, the defendants' statement of facts has been adopted by the court with a few minor alterations.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Ins. Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[6] Roberts' declaration is found at Defendants' Evidentiary Submission Volume III, Part A, tab 4.  (Doc. 91).

[7] Sherrill's declaration is found at the Defendants' Evidentiary Submission Volume III, Part B, tab 7.  (Doc. 91).  Sherrill's deposition excerpts are found at tab 21.

through various documents executed by the plaintiffs at the beginning of their employment with SCES, including their applications for employment, offer letters, the employee handbook, confidentiality agreements, and intellectual property agreements.

For instance, the vast majority of the plaintiffs signed applications for employment with SCES. Their applications state that their at-will status could only be modified by an officer through a written agreement:

> I also understand and agree that nothing in this employment application, in the Company's policy statement, personnel guidelines or employee handbook is intended to create an offer of employment or an employment contract between the Company and me. I understand and agree that employment and compensation with the Company will be on an at-will basis, meaning that my employment will be for no definite duration and can be terminated, with or without cause and with or without notice, at any time, at the option of either the Company or myself. Further, I understand that, except for an officer of the Company, no supervisor or manager may alter or amend my at-will employment status and only an officer of the Company has the authority to enter into any agreement for employment for a specified period of time and any such agreement must be in writing and executed by the Company and me. My signature below certifies that I understand that the foregoing is the sole and entire understanding between the Company and me concerning the duration of my employment and the circumstances under which my employment may be terminated and supersedes all prior arrangements, understandings and representations concerning my employment with the Company.[8]

In addition, after their interviews for employment, the vast majority of the plaintiffs received offer letters, which outlined that the plaintiffs' employment was terminable at-will. These offer letters stated in part:

> While we anticipate a long and mutually beneficial relationship, we recognize

---

[8] Bess Dep., pp. 23-25, DX 83 ("DX" refers to Defendants' Exhibits, which are found at Doc. 91); Bray Dep., pp. 15-16, DX 2; Brookshire Dep., pp. 53-55, DX 30; Childers Dep., pp. 20-21, DX 338; Davidson Dep., pp. 50-51, 54, DX 69; Henley Dep., p. 40, DX 96; Johns Dep., pp. 36, 38-39, DX 136; McKinnon Dep., pp. 26-27, DX 282; Mills Dep., pp. 17-18, DX 270; Moorehead Dep., pp. 42-43, DX 318; Padgett Dep., pp. 23-24, DX 293; Rickels Dep., pp. 23-24, DX 349; Robertson Dep., pp. 21-22, DX 422 (Alabama Power Company Application); Walther Dep., pp. 48-50, DX 366; Welch Dep., pp. 33-34, DX 395 (emphasis added). These exhibits are located at Defendants' Evidentiary Submission, Volume II, Part A-E. (Doc. 91).

your right to terminate this relationship at any time, and similarly, we reserve the right to alter, modify, or terminate this employment relationship at any time for any or no cause.[9]

The vast majority of the plaintiffs also received a copy of the SCES Employee Handbook.[10] The handbook reiterated that the plaintiffs' employment could be terminated at any time without reason or cause. Moreover, the handbook provided that the plaintiffs' at-will employment status could not be modified by any company marketing or recruiting materials:

> . . . . The manual does not restrict the discretion of management to make work assignments, to revise or make exceptions to policies (except for the employment-at-will status of its employees), to hire, promote, demote, and terminate employees at will. . . .[11]
>
> . . . .
>
> Employees without a written employment contract with the company for a specific, fixed term of employment are employed at will for an indefinite period. At-will employment status means that the employee who does not have a separate individually written contract is subject to discharge at any time, for any reason, with or without cause.
>
> **Management personnel are not to make any representations to employees or applicants concerning the terms or conditions of employment with the company which may alter the at-will nature of employment or imply that discharge will occur only for cause.**

The employment-at-will policy may not be modified by any statements contained

---

[9] Bess Dep. pp. 42-43, DX 84; Bray Dep. pp. 51, 57-59, DX 3; Brookshire Dep. pp. 58-59, DX 31; Childers Dep. pp. 38-39, DX 339; Davidson Dep., pp. 55-56, 242-43, DX 70; Hardy Dep., pp. 35-36, DX 246; Henley Dep., pp. 54-55, DX 97; Johns Dep., pp. 48-49, DX 137; McKinnon Dep., pp. 46-47, 50-51, DX 283; Mills Dep., pp. 30-31, 34, DX 271; Moorehead Dep., pp. 40-41, DX 317; Padgett Dep., p. 28, DX 294; Rickels Dep., p. 49, DX 350; Walther Dep., pp 46-48, DX 365; Welch Dep., pp. 30-31, 33, DX 394.

[10] Roberts Decl. at ¶ 5, Ex. A (DX 4) (SCES Employee Handbook, pp. 1.1, 19.1); Bess Dep., p. 52; Bray Dep., pp. 53-57; Brookshire Dep., pp. 64, 66-67; Burkhalter Dep., pp. 49, 51, 61; Hardy Dep., pp. 46-47, 213; Henley Dep., pp. 64-67; Maldon Dep., pp. 49-50; Moorehead Dep., p. 46; Rickels Dep., pp. 55-58, 340, DX 590; Padgett Dep., pp. 34-36; Walther Dep., pp. 56-58; Welch Dep., pp. 38-39; Wilson Dep., pp. 57-58 (all new employees were provided handbook).

[11] The Introduction of the SCES Handbook, quoted above, was placed on the bulletin boards in the PowerCall office. (Walther Dep., pp. 58-59).

in this document or any other employee handbooks, employment applications, company recruiting materials, company memoranda, or other materials provided to applicants and employees in connection with their employment.

At the commencement of their employment, the vast majority of the plaintiffs entered into a Confidentiality Agreement and an Intellectual Property Agreement, both of which defined their employment as at-will:

Employment means my present or future job with the Company. Employment with the Company is, has been, and after this Agreement continues to be "employment at will."[12]

All the plaintiffs (with the exception of Greg Wilson[13]) allege that they were "led to believe" they had lifetime employment with SCES. Their belief that they had "lifetime" employment is based on two alleged events. First, many of the plaintiffs testified that at the time they were interviewing for employment with PowerCall, they were told by supervisors and managers that PowerCall would not be sold, that they had a job as long as they adequately performed their jobs, and/or that they could retire from the company.[14] Second, some of the plaintiffs allege that during their interviews for employment they were shown a marketing card that contains questions and answers. One of the questions is "Will your company be sold[?]". The answer provided to this question states, "not an option . . . [whereas] most existing [security

---

[12] Roberts Decl., ¶ 6, Exs. B-E; Bess Dep., pp. 188-90, DX 562, 563; Childers Dep., pp. 163-65, DX 602, 603; Henley Dep., pp. 312-15, DX 572, 573; Johns Dep., pp. 162-64, DX 569-70; McClinton Dep., p. 73; McKinnon Dep., Vol. II, pp. 6-8, DX 535-36; Mills Dep., Vol. II, pp. 8-10, DX 529-30; Moorehead Dep., Vol. II, pp. 6-8, DX 551-52; Padgett Vol. II, pp. 6-8, DX 540-41; Rickels Dep., pp. 306-09, DX 587, 588; Walther Dep., pp. 197-200, DX 599, 600; Welch Dep., pp. 148-50, DX 591, 592; Wilson Dep., pp. 199-202, DX 607, 608.

[13] Wilson does not believe he had lifetime employment with SCES, and testified during his deposition that no one promised him "lifetime" employment. (Wilson Dep., p. 208).

[14] Bess Dep., pp. 77-79, 162-63; Bray Dep., pp. 37, 41-42, 79-80; Brookshire Dep., pp. 45-47; Burkhalter Dep., pp. 27-28; Childers Dep., p. 36; Davidson Dep., pp. 36-41, 45, 190; Hardy Dep., pp. 32-33, 168, 180; Henley Dep., pp. 47-50, 269-70; Johns Dep., pp. 41-42, 131; Maldon Dep., pp. 111, 178-80; McClinton Dep., pp. 54-58; McKinnon Dep., p. 40-42, 44; Mills Dep., p. 25; Moorehead Dep., pp. 33, 35-36; Padgett Dep., pp. 121-22; Rickels Dep., pp. 44-45; Walther Dep., pp. 36-37, 39, 41-42; Welch Dep., pp. 25-31.

6

companies] are for sale now." (DX 7).[15]

Employees of Southern Company entities (including SCES) were offered the opportunity to participate in several types of ERISA-governed welfare benefit and pension plans, including medical, dental, vision, life insurance, accidental death and dismemberment, long-term and short-term disability, 401(k), and retirement plans. (Janis Williams Decl., ¶¶ 3, 4, Exs. A-L).[16] The plaintiffs were participants in these employee welfare and pension plans, which were sponsored and maintained for the benefit of SCES employees.[17] All of these employee benefits were provided to SCES employees on an at-will basis. Disclaimers contained in the publications provided to the plaintiffs about these benefits set out that the company could change or eliminate these benefits at any time. (Janis Williams Decl., ¶¶ 3-5, Exs. A-M). For instance, during their employment, all the plaintiffs were provided a Southern Company "Your Guide to Benefits," which contained information relating to the benefit plans applicable to SCES employees. The guide stated in part:

> The benefit plans described in this guide are intended to be continued. However, the Company has the right to change or end benefits at anytime without advance notice.[18]

---

[15] According to PowerCall's managers and several of the plaintiffs, the marketing card was not used after 1999. Walther Dep., pp. 92-93 (card was not used after December 1999); Wilson Dep., pp. 105-06, 27-28 (card was not used after Wilson was hired in May 1999); Rickels Dep., pp. 256-58 (card was only used in 1998 and 1999); Robertson Dep., pp. 42-43, 45-47 (use of marketing card should have been discontinued in 1998 or 1999 and none of PowerCall's managers knew it was being used in 2000).

[16] Janis Williams' declaration is found at Defendants' Evidentiary Submission, Volume III, Part B, tab 9. (Doc. 91).

[17] Neither David Sherrill nor Gerald Williams has ever exercised any discretionary authority or control or served as an ERISA fiduciary with respect to any employee welfare benefit plan or pension plan sponsored and maintained for the benefit of employees of SCES. (Janis Williams Decl., ¶ 4).

[18] Janis Williams Decl., ¶ 7, Ex. N (DX 5) (Your Guide to Benefits, Table of Contents); Bess Dep., pp. 53-54; Bray Dep., pp. 59-61; Brookshire Dep., pp. 65-67; Burkhalter Dep., pp. 51-52; Davidson Dep., pp. 68-69; Hardy Dep., pp. 47-48; Johns Dep., pp. 56, 58-59; Maldon Dep., pp. 51-53; McClinton Dep., pp. 32-34; McKinnon Dep., pp. 49-50; Mills Dep., pp.

(continued...)

The plaintiffs were also given a brochure entitled "Employee Benefits." The brochure summarized Southern Company benefits and on the cover stated that the company may amend or terminate the benefit plans at any time.[19] Similarly, the SCES Employee Handbook stated that "[t]he company may amend or terminate these [benefit] plans at any time." (Roberts Decl., Ex. A (DX 4), pp. 4-6).

Moreover, in May 2000, each plaintiff received a 2000 Total Compensation Statement, which was customized to reflect the value of the benefits in which the employee was participating. Each Total Compensation Statement provided on the last page in part:

> While Southern Company expects to continue the plans described herein, the company reserves the right to change, amend or terminate any plan at any time. Participation in these plans does not constitute a guarantee of employment.[20]

## II. THE DECISION TO SELL POWERCALL

### A. Diversification Philosophy Driving the Development of PowerCall

At the time PowerCall began operations in 1995, Southern Company was facing the possibility of deregulation of the utility industry. In order to prepare for this anticipated increase in competition, Southern Company decided to attempt to strengthen its relationship with its utility customers by offering them a broader range of services. PowerCall was formed to provide

---

[18](...continued)
37-39, Vol. II, pp. 14-15; Moorehead Dep., pp. 46-48; Padgett Dep., p. 39; Rickels Dep., p. 297, DX 364; Walther Dep., p. 59; Welch Dep., pp. 39-40; Wilson Dep., p. 59.

[19] Declaration of Alison Gregory, formerly Alison Skipper (hereinafter "Skipper Decl.,") ¶ 3, Ex. A (DX 172); Brookshire Dep., pp. 289-90; Davidson Dep., p. 232; Hardy Dep., pp. 48-49; Johns Dep., pp. 164-65; McClinton Dep., pp. 34-37; Padgett Dep., p. 40, DX 549-50; Rickels Dep., pp. 61-62; Robertson Dep., pp. 35-37; Walther Dep., p. 61, DX 370; Welch Dep., pp. 40-41; Wilson Dep., pp. 61-62.

[20] Janis Williams Decl., ¶ 7; Bess Dep., pp. 58-59, DX 85; Bray Dep., pp. 74, 76, DX 8; Brookshire Dep., pp. 68-70, DX 32, 479 (1999); Burkhalter Dep., pp. 63-64, DX 53; Hardy Dep., pp. 50-51, DX 247; Henley Dep., pp. 75-76, DX 99; Johns Dep., pp. 61-62, DX 138; Maldon Dep., pp. 57-58, DX 516; McClinton Dep., pp. 42-43, DX 175; Mills Dep., pp. 40-41, DX 272; Moorehead Dep., pp. 50-52, DX 319; Padgett Dep., pp. 42-43, DX 299; Rickels Dep., pp. 75-76, DX 351; Robertson Dep., p. 44, DX 424; Walther Dep., pp. 63-64, DX 368; Welch Dep., p. 43, DX 396; Wilson Dep., pp. 63-64, DX 406.

security services to Southern Company customers as part of this diversification strategy. Consequently, the initial focus at PowerCall was providing superior customer service, rather than becoming independently profitable.[21]

### B. Change in Philosophy under Bertram Sears in 2000

In late 1998, Bertram Sears became the CEO and President of SCES and PowerCall.[22]  In early 1999, after receiving the 1998 end-of-the-year financial results, Sears began conducting intensive reviews of each of SCES's six business units.  PowerCall was the last business unit that Sears reviewed, and Sears did not begin that review until early 2000.  (Sears Decl., ¶¶ 2-3).[23]

By the time Sears began his review of PowerCall in early 2000, the fear of deregulation had significantly diminished.  Southern Company's former diversification philosophy was replaced with a new emphasis on profitability.  (Sherrill Decl., ¶ 4; Roberts Dep., pp. 39-40).  In February 2000, as part of Sears' review of PowerCall, Sears conducted several meetings with David Sherrill and Tony Roberts (the two most senior managers of PowerCall) to examine PowerCall's efficiency and to determine whether PowerCall could meet its growth and profitability projections.  Roberts showed Sears several analyses and projections that revealed that PowerCall, in all likelihood, would not meet its profitability goals for several years to come. (Sears Decl., ¶ 4).

---

[21] Sherrill Decl., ¶ 3; Sherrill Dep., p. 18.  *See also* Maldon Dep., pp. 108-110 (David Sherrill and Tony Roberts discussed diversification philosophy due to possible deregulation).

[22] At the time the sale was announced in July 2000, Defendant Gerald Williams was the Alabama Area Manager (replacing Rodney Kimbrell, who had held that position until approximately September 1999).  The Area Manager reported to Anthony Roberts (General Services Manager), who reported to Defendant David Sherrill (Customer Service Manager), who reported to Bertram Sears (CEO and President).  (Roberts Dep., pp. 6-8; Sears Dep., p. 8; Gerald Williams Dep., p. 32; Sherrill Dep., pp. 11-12; Kimbrell Dep., p. 9; Roberts Decl., ¶ 3).

[23] Sears' declaration is found at Defendants' Evidentiary Submission, Volume III, Part A, tab 5.  (Doc. 91).

### C. Sears' Analyses and Presentations to the PowerCall Board of Directors and Southern Company Executives

Sears, as CEO and President, reported to the PowerCall Board of Directors (hereinafter "the Board"). On May 10, 2000, at a regularly scheduled Board meeting, Sears presented PowerCall's first quarter 2000 update, which revealed dismal net income results. Sears informed the Board that by the end of June 2000, he would provide the Board with (1) a prediction as to the amount of support PowerCall would require from Southern Company in order to continue its operations and (2) a recommendation as to whether PowerCall should be sold. (Sears Decl., ¶ 5, Exs. A-B).

In May 2000, Sears met with Allen Franklin, Southern Company's Chief Operating Officer, and informed Franklin of PowerCall's poor profit projections. Despite the profit projections, Franklin initially did not support the idea of selling PowerCall. Franklin did not want Southern Company to abandon the security business so soon after entering it. Accordingly, Franklin instructed Sears to determine if there was a way to make PowerCall profitable before Sears made any recommendation to the Board. Complying with Franklin's request, Sears re-examined the PowerCall reports and concluded that even under the most favorable circumstances and assumptions, that PowerCall would become profitable, at the earliest, in 2008. (Sears Decl., ¶¶ 6-7).

On May 30, 2000, Sears made a presentation concerning PowerCall to his supervisor, Southern Company's Chief Marketing Officer, Paul Bowers. This presentation contained a forecast of revenues and net income and a breakeven point analysis, both of which revealed that PowerCall was not going to become profitable until several years in the future, and even then only

if PowerCall met unrealistic marketing goals. Sears' presentation to Bowers listed seven different possible scenarios for PowerCall: (1) Continue with current business plan; (2) Grow primarily through acquisition; (3) Close coastal offices; (4) Stop all residential sales - - commercial sales only; (5) Stop all residential and commercial sales - - rely on revenue from existing customers; (6) Stop all residential sales - - commercial sales in Atlanta and Birmingham only; or (7) Divest. Sears' recommendation to Bowers was to divest. (Sears Decl., ¶ 8, Ex. C). Bowers agreed that Sears should present this recommendation to the Board, which was the entity responsible for making the decision about whether PowerCall should be sold. (Sears Decl., ¶ 8).

### D. The Board's June 12, 2000, Decision to Seek an Acceptable Purchaser

On approximately June 12, 2000, Sears made a presentation to the Executive Committee of the PowerCall Board. In his presentation, Sears outlined his analysis of PowerCall's business and he told the Board what would be required to make PowerCall profitable, including drastically reducing costs, focusing solely on markets with the greatest growth potential, and creating significant numbers of additional leads through other Southern Company subsidiaries. In light of PowerCall's financial projections, Sears recommended that PowerCall be sold. (Sears Decl., ¶ 9, Ex. D). Several Board members challenged Sears' divestiture recommendation. They, like Franklin, were concerned about entering and exiting a business so quickly and what effect such a decision would have on Southern Company's brand name. Ultimately, however, on June 12, 2000, the Board decided to allow Sears to seek an acceptable purchaser for PowerCall. (Sears Decl., ¶ 9; Sears Dep., pp. 35-36).

### III. COMMUNICATIONS REGARDING THE POTENTIAL SALE OF POWERCALL

11

### A. Pre-Decision Rumors Regarding the Sale

Prior to June 12, 2000, when the Board made the decision to try to sell the assets of PowerCall, no one (including SCES's management) knew whether PowerCall would be offered for sale. (Sears Decl., ¶ 10; Sherrill Decl., ¶ 5; Roberts Decl., ¶ 7). However, in 1999 and early 2000, several of the plaintiffs had heard rumors from various sources that PowerCall was actually up for sale. Between February 2000 and early June 2000, some of the plaintiffs questioned Gerald Williams and others whether the rumor was true.[24] Williams told the plaintiffs that the rumor that PowerCall was for sale was not true. At the time, Williams and others stated that PowerCall was not for sale, no decision had been made to sell PowerCall and Williams had no knowledge of a possible sale in the future. (Sears Decl., ¶¶ 9-10; Gerald Williams Decl., ¶ 4).

### B. Communication of Sale Decision to Area Managers Including Gerald Williams

After the Board made the decision on June 12, 2000, to seek an appropriate purchaser, Sherrill and Roberts worked on communications and other divestiture plans. Then, David Sherrill held a conference call with the Area Managers, including Gerald Williams, on June 21, 2000. Sherrill did not tell Area Managers during this conference call that PowerCall's assets would be put up for sale, but he did instruct the Area Managers to implement a hiring freeze and he promised to provide additional information during an in-person meeting in Atlanta, Georgia, on June 29, 2000. (Sherrill Decl., ¶¶ 7-8).

On June 29, 2000, Sears and Sherrill met with PowerCall's Area Managers, including

---

[24] Bess Dep., pp. 66-67, 73-75; Bray Dep., pp. 84-86; Brookshire Dep., p. 87; Burkhalter Dep., pp. 70-71, 77, 209; Davidson Dep., pp. 94-99; Hardy Dep., pp. 83-85; Henley Dep., pp. 114-17; Johns Dep., pp. 65-69; McClinton Dep., pp. 114-19; Mills Dep., pp. 44, 46-48; Padgett Dep., p. 58; Rickles Dep., pp. 115, 146-57; Robertson Dep., pp. 54-55, 63-64; Walther Dep., pp. 76-82; Welch Dep., pp. 59-61; Wilson Dep., pp. 82-84.

Gerald Williams, in Atlanta. During this meeting, Sears and Sherrill informed the Area Managers for the first time that the Board had decided to sell the assets of PowerCall. They also explained the rationale for the Board's decision to divest, including the change in philosophy from diversification to profitability. Sherrill informed the Area Managers that employee meetings would be held in early July (*i.e.*, within a week) to announce the decision.[25] (Sherrill Decl., ¶ 9). This was the first time Williams learned that PowerCall was "for sale." (Gerald Williams Decl., ¶ 4; Sherrill Decl., ¶ 10; Gerald Williams Dep., p. 11).[26]

### C. Communication of Sale Decision to Employees in Alabama

SCES decided in advance to inform PowerCall employees that it was seeking a purchaser to buy the assets of PowerCall. (Sherrill Decl., ¶ 11). On July 5, 2000, Gerald Williams called a meeting to inform the Alabama PowerCall employees that PowerCall's assets would be offered for sale.[27] (Gerald Williams Decl., ¶ 5; Gerald Williams Dep., p. 11).

On July 7, 2000, Sherrill called another meeting with Alabama PowerCall employees (including all the plaintiffs except Sean Maldon[28]) to provide them with further information regarding the potential sale. During this meeting, Sherrill explained the reasons why PowerCall's assets would be sold and described the poor profit projections for the company. Sherrill also told

---

[25] Human Resources Representative Janis Williams took notes of the June 29, 2000 meeting. (Janis Williams Decl., ¶ 10, Ex. O).

[26] Gerald Williams' declaration is found at Defendants' Evidentiary Submission, Volume III, Part B, tab 8. (Doc. 91).

[27] Some of the plaintiffs testified that Gerald Williams read a list of questions and answers at the July 5 meeting, and other plaintiffs testified Sherrill read the list at the July 7, 2000, meeting. Bray Dep., pp. 94-96; Bess Dep., pp. 82-88; Brookshire Dep., pp. 98-99, 292-94; Burkhalter Dep., p. 86; Childers Dep., pp. 171-72; Davidson Dep., pp. 102-03; Hardy Dep., pp. 90-91, 208; Henley Dep., p. 129; Johns Dep., pp. 76, 167-68; Maldon Dep., pp. 105-06; McClinton Dep., pp. 131-32, 135-38; Padgett Dep., p. 62; Walther Dep., p. 93; Wilson Dep., pp. 95-98, 205-07.

[28] Maldon was absent from the July 7, 2000 meeting. (Maldon Dep., pp. 99, 103-04).

employees that: (i) he anticipated the sale would take place prior to December 31, 2000; (ii) the goal was to find a purchaser that wanted to maintain a viable turnkey business; and (iii) SCES was seeking a purchaser that would maintain a "style" similar to Southern Company's style. (Sherrill Decl., ¶ 12; McClinton Dep., pp. 139-41).

Although the plaintiffs allege that during the July 7, 2000, meeting Sherrill also made statements regarding what their employee benefits would be with the purchasing company, the plaintiffs do not agree among themselves as to what Sherrill said regarding benefits. Some of them testified during their depositions that Sherrill stated that PowerCall would try to sell to a company with "comparable" benefits, some plaintiffs testified that Sherrill stated that PowerCall would only be sold to a company with the "same" benefits, and some plaintiffs testified that Sherrill used other terms such as, "like," "equal," or "equivalent" to describe the benefits.[29] However, at this juncture, a purchaser had not been identified, and Sherrill had no knowledge of what benefits might be available with the purchasing company. Sherrill states that his intention was to try to sell the assets of PowerCall to a company which had the same or comparable benefits as employees had at SCES. (Sherrill Decl., ¶ 13).

## IV. RETENTION OF EMPLOYEES AND ASSISTANCE IN FINDING JOBS WITHIN SOUTHERN COMPANY PENDING THE SALE

---

[29] Bess Dep., pp. 82, 85, 88-89 ("same benefits"); Bray Dep., pp. 95-96, 105-07 ("similar or same"); Brookshire Dep., p. 99 ("we will try to sell to a company with comparable benefits"); Burkhalter Dep., pp. 87, 91 ("same benefits," but later Sherrill said "comparable or similar benefits"); Childers Dep., pp. 71, 73 ("equal benefits and pay"; may have used "comparable benefits" later); Davidson Dep., pp. 84-86, 90, 104-06, 191 ("comparable or equal type benefits"); Hardy Dep., p. 91 (will "try to sell to a company that carries the same benefits"); Henley Dep., pp. 130, 158 ("equal or same benefits" later changed to "comparable" months later); Johns Dep., pp. 72-74 ("like benefits"); McClinton Dep., p. 138 ("equal or same" benefits; later changed to "comparable"); McKinnon Dep., pp. 72-73 ("equal benefits"); Moorehead Dep., pp. 64-66 ("equal or greater benefits"); Padgett Dep., pp. 63, 64 ("same or equal benefits" or "comparable benefits"); Rickels Dep., pp. 177-79, 192-94, 197 (does not recall what Sherrill stated about benefits in July meeting, but alleges other management stated benefits would be "the same"); Robertson Dep., pp. 74-77 (we are "looking for a company that would have comparable benefits"); Walther Dep., pp. 96, 118 ("same or equal benefits" stated in July; "comparable benefits" stated in November 2000); Welch Dep., pp. 55-56 ("equal or better benefits"; changed to "comparable benefits" later); Wilson Dep., pp. 101-03 ("same" and "comparable" benefits). *Compare* Sherrill Decl., ¶ 13.

14

### A. Retention Agreements Confirming At-Will Status

Following the announcement of the potential sale in July and August of 2000, all the plaintiffs were offered Retention Award Agreements. The Retention Award Agreements provided that an employee would receive $250.00 for each month he or she remained with PowerCall from the date of the agreement until the date the assets of PowerCall were sold. The Retention Award Agreements further stated in part:

> No provision of this Agreement shall be construed to affect in any manner the existing rights of the Company to suspend, terminate, alter, modify, whether or not for Cause, the employment relationship of [the employee] and the Company.

(Retention Award Agreement, ¶ 11). All of the plaintiffs except Rodney Rickels elected to sign their Retention Award Agreements.[30]

### B. Efforts to Help Employees Find Jobs Within the Southern Company System

Between July and October 2000, SCES made efforts to assist employees who were interested in locating employment within other Southern Company subsidiaries. A human resources employee, Alison Skipper, was assigned to assist PowerCall employees with obtaining other employment within Southern Company. For several weeks, Skipper was physically present at PowerCall's facility in Birmingham, and subsequently she was on-call in the event an employee needed assistance in applying for positions with Southern Company subsidiaries. (Skipper Decl.,

---

[30] Roberts Decl., ¶ 8; Bess Dep., pp. 95-96, DX 86; Bray Dep., pp. 138-40, DX 14; Brookshire Dep., pp. 110-12, DX 34; Burkhalter Dep., pp. 94-95, DX 54; Davidson Dep., p. 42, DX 71; Hardy Dep., p. 99, DX 249; Henley Dep., pp. 134-35, DX 103; Johns Dep., p. 82, DX 139; Maldon Dep., p. 117, DX 519; McClinton Dep., pp. 153, 237-38, DX 183; McKinnon Dep., pp. 78-79, DX 284; Mills Dep., p. 60, DX 273; Padgett Dep., p. 72, DX 302; Rickels Dep., pp. 187-88 (did not sign retention agreement); Robertson Dep., pp. 85-86, DX 426; Walther Dep., pp. 107-10, DX 377; Wilson Dep., pp. 111-12, DX 407; Welch Dep., pp. 77-78, 81-83, DX 397.

¶ 4).[31]  For example, Skipper assisted PowerCall employees in scheduling tests to become linemen with Alabama Power Company, a Southern Company subsidiary.  (Skipper Decl., ¶ 4, Ex. B; Maldon Dep., pp. 112-15; Welch Dep., p. 53).

In addition, at a staff meeting, employees were informed: (1) how to apply for jobs through Southern Company's computerized job posting system or by phone;[32] (2) how to obtain letters of recommendation from PowerCall; and (3) how to complete tests for Alabama Power Company Helper jobs.  A human resources employee, Janis Williams, also sent a letter to all Southern Company human resources employees asking them to consider hiring PowerCall employees to fill open positions.[33]  (Janis Williams Decl., ¶ 11, Ex. P).

Defendant Gerald Williams also helped some of the Alabama PowerCall employees obtain jobs elsewhere within the Southern Company system.  Gerald Williams wrote reference letters for some of his employees (including several of the plaintiffs) to assist them in obtaining alternate employment.  (Gerald Williams Decl., ¶ 6; Henley Dep., pp. 223-26).

A number of PowerCall employees were successful in finding jobs with other Southern Company subsidiaries between July and November 2000.[34]  On October 30, 2000, defendant Gerald Williams left his position as Area Manager of PowerCall and was hired by Southern LINC,

---

[31] Skipper's (Gregory) declaration is found at Defendants' Evidentiary Submission, Volume II, Part A, tab 2.  (Doc. 91).  Henley Dep., pp. 93-96; McClinton Dep., pp. 150-51; Padgett Dep., pp. 51-52; Robertson Dep., pp. 88-89; Wilson Dep., pp. 78-79, 81; Sherrill Dep., p. 29.

[32] Janis Williams also placed available Southern Company Job Net postings on the PowerCall bulletin board. (Davidson Dep., pp. 64-65, 82, 90-91; Walther Dep., pp. 87-88).

[33] Bess Dep., p. 62 (employees were told to review Southern Company postings to locate other jobs); Bray Dep., p. 132 (Job Net was available to assist employees to find another job within Southern Company); Walther Dep., pp. 90-91 (Skipper and Janis Williams discussed openings with employees).

[34] Roberts Decl., ¶ 9; Skipper Decl., ¶ 5; Gerald Williams Decl., ¶ 7; Henley Dep., pp. 207-08.

16

a Southern Company subsidiary.  (Gerald Williams Decl., ¶ 8; Henley Dep., p. 151; McClinton

Dep., p. 336, DX 210; Gerald Williams Dep., p. 6).

### C. Efforts to Coordinate Interviews and Release Dates for Employees Who Were Offered Jobs with Southern Company Entities

Because PowerCall management anticipated that some PowerCall employees would find

other employment within the Southern Company system prior to the sale of the company, during

the July through November 2000 time period, PowerCall's managers asked human resources

personnel to assist with scheduling PowerCall employees' interviews with other Southern

Company entities and negotiating release dates for PowerCall employees who found jobs.

(Sherrill Decl., ¶ 14; Roberts Dep., pp. 12-13; Sherrill Dep., pp. 25-26, 28).

On July 25, 2000, Human Resources Representative Janis Williams sent a memorandum

to all Southern Company human resources employees regarding the sale of PowerCall, asking

them to inform her of any interviews and job offers relating to PowerCall employees so that she

could help PowerCall manage the impact of losing such employees.  Williams emphasized that

there was no intention to prevent PowerCall employees from obtaining jobs within other Southern

Company entities.  The memorandum states in part:

> A couple of weeks ago, PowerCall management communicated to the employees
> the intent to sell PowerCall Security.  The best opportunity is to sell a turnkey
> business with as high a value as possible, therefore business continuation is an
> essential element.  While the desire of management is the placement of employees,
> either with Southern Company or the acquiring company, we must continue
> business as usual in serving PowerCall customers.
>
> The contributions of some employees will be needed for a longer time period than
> others just by the nature of their jobs.  Therefore, we would request that, as jobs are
> available in your client organizations and PowerCall employees are considered, we
> be made aware of such considerations to manage impact to the organization and
> necessary work.  Depending on the individuals, we may need to request flexibility

17

in scheduling interviews or determining report dates as job offers are extended. Please understand that we do not want to prohibit opportunities for employees, but must balance business needs with placement efforts.

(Janis Williams Decl., ¶ 12, Ex. Q).

Via e-mail, Sherrill forwarded Janis Williams' letter to all Area Managers and requested that the Area Managers share the letter with employees as appropriate. Sherrill's e-mail noted that PowerCall management was supportive of all efforts to find jobs for employees, and emphasized: "AGAIN - WE DON'T WANT TO PROHIBIT ANY HIRING BUT WE MUST NEGOTIATE AND BALANCE THE NEEDS OF ALL INVOLVED DURING THIS PROCESS." (Sherrill Decl., ¶ 15, Ex. A).

## V. SEARCH FOR A PURCHASER AND SELECTION OF PROTECTION ONE

### A. Request for Proposals from Potential Buyers

PowerCall's management began searching for an acceptable purchaser for PowerCall's assets in July 2000. The search was coordinated and managed by Sherrill, the most senior manager at PowerCall. Throughout Sherrill's search for an acceptable purchaser, one of Sherrill's priorities was to find a buyer who would hire PowerCall's employees on substantially similar terms as those employees had been employed by SCES, as reflected in many of Sherrill's key communications with potential purchasers. (Roberts Dep., p. 15; Sherrill Decl., ¶ 17).

Sherrill first sent a Confidentiality Agreement to a number of companies he had identified as potential purchasers. Fourteen companies returned signed copies of the Confidentiality Agreement and requested more information about purchasing PowerCall's assets. The feedback Sherrill received from these fourteen prospective buyers indicated that they were interested in hiring PowerCall employees if they purchased PowerCall's assets. (Sherrill Decl., ¶ 18, Ex. B).

18

By September 13, 2000, PowerCall had received letters of interest from seven of the fourteen prospective buyers. Over the next three weeks, four of these prospective buyers elected to conduct due diligence, interviews, and inspections of PowerCall's operations. (Sherrill Decl., ¶ 19, Ex. C). Following this due diligence period, on October 4, 2000, PowerCall mailed a Request for Proposals and a draft Asset Purchase Agreement to the four prospective buyers. The draft Asset Purchase Agreement required that:

> Within (10) days after the execution of this Agreement, Buyer shall offer employment to all employees of Seller . . . on substantially similar terms as such employees are employed by Seller.

(Sherrill Decl., ¶ 20, Ex. D, Draft Asset Purchase Agreement, § 6.1). To ensure that this provision would be met, PowerCall's Request for Proposals required the bidders to submit a list of PowerCall employees designated for job offers by classification, location, salary and benefits, as well as a detailed list of the bidder's employee benefits and percentages of benefits to salary. (Sherrill Decl., ¶ 20, Ex. D, Request for Proposals, §§ 2.2(D), (E)). Sherrill intended to examine each bidder's proposal to assess whether that bidder intended to hire the PowerCall employees and what benefits would be provided to those employees. (Sherrill Decl., ¶ 20).

### B. Pro One Selected as the Purchaser

When the bid deadline of October 24, 2000, expired, PowerCall had received two bids for the purchase of its assets. Sherrill eliminated one of the bidders as a prospective buyer in part because that bidder did not desire to employ any of PowerCall's employees. The other bidder was Protection One, Inc. (Sherrill Decl., ¶ 21). Pro One's proposal to PowerCall stated in relevant part that: Pro One intended to hire (subject to interviews) all of the PowerCall employees at their current pay amounts with limited exceptions; Pro One would consider salary adjustments to

compensate for any benefit differential between PowerCall and Pro One; and the average percentage of Pro One's benefits to salary was approximately 34% compared to 37% for PowerCall. (Sherrill Decl., ¶ 21, Ex. E, pp. 4640-41). Pro One also sent PowerCall a revised draft of the Asset Purchase Agreement, in which Pro One agreed that it "shall offer employment to such employees on substantially similar terms as such employees are employed by Seller." (Sherrill Decl., ¶ 21, Ex. E, p. 4671). Sherrill reviewed Pro One's proposal and revised Asset Purchase Agreement, specifically noting Pro One's commitments concerning the employment and benefits it would offer to PowerCall's employees. (Sherrill Decl., ¶ 21).

On October 25, 2000, Sherrill recommended to Sears that PowerCall's assets should be sold to Pro One. Sherrill's recommendation was based in part on Pro One's representations in its proposal and the revised Asset Purchase Agreement that Pro One intended to hire virtually all of PowerCall's employees and compensate those employees for any difference in the benefits between the two companies. (Sherrill Decl., ¶ 22). PowerCall and Pro One entered into the Asset Purchase Agreement on November 3, 2000. (Sherrill Decl., ¶ 23, Ex. F).

While Sherrill expected Pro One to live up to its commitments regarding the employment and benefits of PowerCall's employees, he wanted to confirm that Pro One would, in fact, adjust employees' salaries for any benefit differential between the two companies. Consequently, Sherrill asked Pro One to put that commitment in writing. At Sherrill's request, Pro One sent Sherrill an e-mail on November 6, 2000 confirming "It is Protection One's intention to compensate each employee for the difference in the value of their current benefits through a base compensation adjustment." (Sherrill Decl., ¶ 24, Ex. G).

**VI. NOVEMBER 7, 2000, ANNOUNCEMENT OF PROTECTION ONE AS THE BUYER**

On November 7, 2000, Sherrill met with PowerCall's Alabama employees to inform them that Pro One would purchase the assets of PowerCall. During this meeting, Sherrill informed employees regarding several upcoming events relating to the sale, including potential interviews by Pro One, offers of employment by Pro One, and the time frame for employees to accept Pro One's employment offers. Sherrill also showed the employees a flow chart that would be followed to determine if employees would be eligible for severance benefits. In addition, Sherrill reviewed with the employees a press release relating to the sale. (Sherrill Decl., ¶ 25, Ex. H).

During the November 7, 2000, meeting, Sherrill also described employee benefits that would be available to employees who chose to accept offers of employment from Pro One. According to notes taken by plaintiff Charlotte Henley during the meeting (and the deposition testimony of virtually all of the plaintiffs), Sherrill informed the employees that Pro One had told him they had no sick time, no pension plan, and only had a $0.50 match on $1.00 for its 401(k) plan. (Henley Dep., pp. 144-47, 152-53, 160-61, DX 105, p. 2).[35] Sherrill also informed the employees that Pro One stated they had medical insurance, long-term and short-term disability insurance, life insurance, and paid time off or personal time. (Sherrill Decl., ¶ 26). Plaintiff Mike Walther had been employed by Pro One prior to being employed by SCES. During the November 7, 2000, meeting, in protest of the decision to sell PowerCall to Pro One, Walther complained in

---

[35] Bray Dep., pp. 212-20; Bess Dep., p. 191; Brookshire Dep., pp. 284-86; Burkhalter Dep., pp. 247-50; Childers Dep., pp. 84-85; Davidson Dep., pp. 227-31; Hardy Dep., pp. 102-03; Johns Dep., pp. 87-89; Maldon Dep., pp. 121-22; McClinton Dep., pp. 184-85; McKinnon Dep., pp. 80-81; Mills Dep., pp. 61-63; Moorehead Dep., pp. 79-81; Padgett Dep., pp. 73-74; Rickels Dep., pp. 203-06; Walther Dep., pp. 115-16; Wilson Dep., pp. 114-15.

front of the other employees[36] that Pro One did not have a pension or retirement plan.[37]  Several of the plaintiffs testified during their depositions that at the November 7, 2000, meeting Sherrill also offered his opinion that Pro One's benefits were "comparable" to those available to PowerCall employees.[38]

Following the November 7, 2000, announcement that Pro One would be purchasing PowerCall's assets, employees who were interested in learning more about Pro One's benefit plans had several opportunities to do so.  First, Pro One's benefits plans were made available in the PowerCall office for all employees to review in case they had any questions.  (Janis Williams Decl., ¶ 14; Mills Dep., pp. 64-66).  Second, on November 20, 2000, Sherrill sent all PowerCall employees an e-mail with an attached print-out of a website that contained questions and answers regarding Pro One's benefits and other aspects of employment at Pro One; (Sherrill Decl., ¶ 27, Ex. I),[39] and a printout of the website was also posted on the PowerCall bulletin board.  (Davidson Dep., pp. 129-31).

## VII.  OFFERS OF EMPLOYMENT AND BENEFITS BY PRO ONE

---

[36] Although not relevant to the issues presented, several plaintiffs testified that in their opinion Sherrill was rude to Walther when Walther expressed his negative opinion of Pro One.  However, plaintiff Greg Wilson testified that Walther had been disruptive and insubordinate during the meeting.  (Wilson Dep., pp. 118-20).

[37] Bess Dep., pp. 103-04; Bray Dep., pp. 127-28; Brookshire Dep., pp. 133-34; Hardy Dep., pp. 111-12; McClinton Dep., pp. 189-90; McKinnon Dep., pp. 81-82; Rickels Dep., p. 207; Walther Dep., pp. 119-20.

[38] Childers Dep., pp. 71, 73; Henley Dep., pp. 130, 158; Maldon Dep., pp. 122-23; McClinton Dep., pp. 138-39; McKinnon Dep., p. 83; Walther Dep., p. 118; Welch Dep., pp. 55-56; Wilson Dep., pp. 101-03.

[39] Bess Dep., pp. 108-09; Brookshire Dep., p. 138; Henley Dep., pp. 164-65; Johns Dep., p. 92; McClinton Dep., pp. 192-93; Rickels Dep., p. 211.

On November 21 and 22, 2000, each plaintiff was given an offer letter from Pro One.  The offer letter stated what each plaintiff's position and salary with Pro One would be.  The plaintiffs also were provided with a Benefit Adjustment Illustration that had been prepared by Pro One.[40] (Roberts Decl., ¶ 18; Janis Williams Decl., ¶ 15).  The Benefit Adjustment Illustration compared SCES benefits to those of Pro One, and in many cases, indicated that an adjustment would be made to the employee's salary in an attempt by Pro One to compensate employees for a difference between the benefits available at Pro One compared to the benefits available at SCES.[41]  On or about November 27, 2000, each plaintiff accepted employment with Pro One pursuant to the terms described in their offer letters.  (Roberts Decl., ¶ 18).

On December 1, 2000, the sale of the assets of PowerCall to Pro One closed.  That same day, all plaintiffs were terminated by SCES and hired by Pro One the following day.  Following the sale, SCES, PowerCall, and Southern Company were not engaged in the security business. (Sherrill Decl., ¶¶ 28-29).

## VIII.  COVENANT NOT TO SOLICIT FORMER POWERCALL EMPLOYEES

At the request of Pro One, the Asset Purchase Agreement entered into between PowerCall and Pro One contained the following Covenant Not to Solicit:

8.2     Covenant Not to Solicit.  For a period of one (1) year following the Closing

---

[40] The Benefit Adjustment Illustration was not prepared by SCES or any of the defendants.  (Janis Williams Decl., ¶ 15).

[41] Bess Dep., pp. 111-13, DX 87; Bray Dep., pp. 141-42, DX 15; Brookshire Dep., pp. 143-46, DX 35-36; Burkhalter Dep., pp. 132-33, DX 55; Childers Dep., pp. 94-96, DX 340; Davidson Dep., pp. 138-40, DX 72; Hardy Dep., p. 114, DX 250; Henley Dep., pp. 167-70, DX 110; Johns Dep., p. 95, DX 140; Maldon Dep., pp. 132-34, DX 520; McClinton Dep., p. 196, DX 188; McKinnon Dep., pp. 95-96, DX 285; Mills Dep., pp. 72-73, DX 274; Moorehead Dep., pp. 91-92, DX 320; Padgett Dep., pp. 80-82, DX 303-04; Rickels Dep., pp. 214-16, DX 352; Robertson Dep., pp. 105-07, DX 427; Walther Dep., pp. 130-31, DX 379; Welch Dep., pp. 91-94, DX 398; Wilson Dep., pp. 123-24, DX 408.; Janis Williams Decl., ¶ 16.

(the "Non-Solicitation Period"), the Seller Affiliates shall not directly or indirectly recruit, offer to employ or otherwise solicit the employment of any person who was at any time within one (1) year prior to such action an employee of Buyer without the prior written consent of Buyer . . . .[42]

This covenant was added to the Asset Purchase Agreement on October 31, 2000. (Sherrill Decl., ¶ 30 (Ex. J); Sherrill Dep., pp. 32, 47-48).

As stated in the covenant, former PowerCall employees who were hired by Pro One could return to employment with a Southern Company entity if written consent from Pro One was obtained. Several former PowerCall employees who found jobs with other Southern Company entities requested and received consent from Pro One to return to those entities.[43] The plaintiffs did not apply for reemployment with any Southern Company entity after the sale of PowerCall's assets (except for Plaintiff Cassandra McClinton, who applied for several jobs but was not selected for any of them).[44] None of the plaintiffs attempted to obtain consent or were denied consent from Pro One to return to Southern Company entities. (Sherrill Decl., ¶ 31).

## IX. ANNUAL BONUSES UNDER THE PERFORMANCE PAY PLAN

During their employment with SCES, the plaintiffs were eligible to receive a bonus under

---

[42] Although the plaintiffs have complained about the covenant not to solicit and argued that SMD wrongfully prevented them from being re-employed with a Southern Company entity for a year following the sale, the covenant is irrelevant to any of their claims in this lawsuit. Therefore, it will not be discussed in detail in this opinion. The court does note, however, in *Cesnik v. Chrysler Corp.*, 490 F. Supp. 859 (M.D. Tenn. 1998), a case involving similar facts to this one, the court held that a similar covenant was justified and did not constitute an intentional interference with business relations.

[43] Sherrill Decl., ¶ 31, Ex. K (DX 194); Burkhalter Dep., pp. 107-08 (Gary House re-employed with Southern Company during one-year non-solicitation period); Davidson Dep., pp. 179-80 (unnamed employee hired by Southern Company entity after sale of PowerCall); Henley Dep., p. 205 (Cheryl James received written consent); McClinton Dep., pp. 242-44 (Cheryl James and Gary House were re-employed by the Southern Company); McKinnon Dep., pp. 139-41 (three employees hired by Southern Company entities after sale of PowerCall); Moorehead Dep., pp. 112, 122-23 (three employees hired by Southern Company entities after sale of PowerCall); Robertson Dep., pp. 153-54 (Costella Cobb and Cheryl James returned to Southern Company entity); Welch Dep., p. 52 (receptionist allowed to return to Southern Company after sale of PowerCall); Wilson Dep., pp. 76-77 (Costella Cobb and Cheryl James returned to work for Southern Company entity).

[44] Janis Williams Decl., ¶ 17; Bess Dep., p. 154; Burkhalter Dep., p. 167; Childers Dep., p. 136; Hardy Dep., p. 152; Johns Dep., pp. 115-16; Maldon Dep., p. 189; McClinton Dep., pp. 245-46; Moorehead Dep., p. 117; Padgett Dep., pp. 108-09; Rickels Dep., pp. 81-82; Walther Dep., pp. 165-66.

Southern Company's Performance Pay Plan ("PPP").  The PPP bonus for a given year was paid in late March during the following year.  The PPP plan stated that the bonus or award was dependent on the achievement of individual, team, organizational, and corporate goals.  Under the PPP plan, an employee had to be employed on December 31 of the year for which the bonus was being paid in order to receive the bonus.  The plan specifically provided that any employee whose employment was terminated during the January 1 to December 31 period for any reason other than those described in the plan would not be eligible to receive a PPP award for that period.  (Janis Williams Decl., ¶ 18, Ex. L; McClinton Dep., pp. 44-46, DX 176).  All plaintiffs were terminated from their employment with SCES on December 1, 2000.  Therefore, the plaintiffs did not receive a PPP award in 2001 for the year 2000, because they were not employed with SCES on December 31, 2000.  (Janis Williams Decl., ¶ 19; Janis Williams Dep., p. 25).

## X.  SALES COMMISSIONS

During their employment with SCES, all PowerCall salespersons were compensated pursuant to a commission plan entitled, "PowerCall Security 2000 Compensation Plans." (Roberts Decl., ¶ 19, Ex. F (DX 6); Rickels Dep., pp. 65-67, 317; Bray Dep., pp. 143-44).  This commission plan established commission rates of 4% to 10% (depending on the profit margin of the sale) for the sale of all commercial security systems.  Pursuant to the commission plan, when a salesperson sold a commercial security system he or she would be paid one-half of the applicable commission rate.  When the project was completed or closed, the salesperson would be paid the remaining unpaid portion of the commission.  (Rickels Dep., p. 129; Roberts Decl., ¶ 20, Ex. F pp. 5-6).  Pursuant to the commission plan, in the event of termination of employment for any reason other than retirement, death, total and permanent disability, or transfer to another Southern

25

Company entity, the terminated salesperson would forfeit the remaining portion of the commission. (Roberts Decl., ¶ 20, Ex. F, p. 4).

At the time of the PowerCall asset sale, there were several security projects or jobs that were not closed or completed. Some of these jobs were "0%" completed at the time of the sale of PowerCall. The vast majority of these projects were sold to Pro One for completion. Accordingly, pursuant to the commission plan, PowerCall salespersons who left their employment with SCES to go to work for Pro One were not paid the remaining portion of their commissions on those projects that had not been completed at the time of the sale. Rather, such commissions were to be paid by Pro One once the project was completed. (Roberts Decl., ¶ 21). On November 22, 2000, Protection One published an addendum to its offer letters to the Residential and Commercial sales staff of PowerCall stating: "[P]lease note that the Residential and Commercial sales staff will be eligible for the same commission plan as written and offered by PowerCall . . . This plan will be applicable for existing and new sales contracts. . . ." (Roberts Decl., ¶ 22, Ex. G (DX 16)).

## DISCUSSION

## I.  COUNT I: BREACH OF CONTRACT - PROMISE NOT TO SELL THE COMPANY

In Count I of the Second Amended Complaint, the plaintiffs allege breach of contract by

defendant SMD (formerly known as SCES) arising out of their allegations that they were told that

PowerCall would never be sold.  The plaintiffs (with the exception of Greg Wilson[45]) contend that

this alleged statement, along with the other similar statements, led them to believe that they had a

"lifetime" employment contract.[46]  However, each of the employment letters offered as evidence

states, "While we anticipate a long and mutually beneficial relationship, we recognize your right

to terminate this relationship at any time, and similarly, we reserve the right to alter, modify, or

---

[45] Wilson Dep., p. 208.

[46] The majority of the plaintiffs provided the following statement as the basis for their claim:  "I was told when I joined Power[C]all . . . that the company would never be sold. . . .  I was lead [sic] to believe that I had a lifetime contract with Power[C]all as long as I performed my job.  I was told . . . as long as I did my job I could retire from the company."  DX 94 (Bess); DX 27 (Bray); DX 45 (Brookshire); DX 65 (Burkhalter); DX 346 (Childers); DX 81 (Davidson); DX 262 (Hardy); DX 132 (Henley); DX 144 (Johns); DX 526 (Maldon); DX 213 (McClinton); DX 289 (McKinnon); DX 277 (Mills); DX 332 (Moorehead); DX 310 (Padgett); DX 438 (Robertson); DX 390 (Walther); DX 401 (Welch).

Further, the plaintiffs testified that their "lifetime" employment claims are co-mingled with their allegations that they were told PowerCall would not be sold.  Bess Dep., pp. 78-79, 162-63, 209-10 (never told had a lifetime contract); Bray Dep., pp. 243-46; Brookshire Dep., pp. 332-33; Burkhalter Dep., pp. 207-08, 272-75 (never told had lifetime employment); Childers Dep., p. 67 (never told had "job for life"; allegations of lifetime employment relate to allegedly being told he could retire from Southern Company); Davidson Dep., pp. 190, 245-46 (never told he had lifetime contract); Hardy Dep., pp. 180, 222-23 (never told had "lifetime" contract; lifetime contract based in part on allegation that company would not be sold); Henley Dep., pp. 265-67, 337-38 (never told she had a "lifetime" contract; lifetime allegations based in part on allegations that company would not be sold); Johns Dep., pp. 131, 168-70 (never told had lifetime contract; allegations of lifetime contract based on alleged representations that company would not be sold); Maldon Dep., pp. 229, 296-97 (lifetime allegations based in part on allegation that company would not be sold); McClinton Dep., Vol. II, p. 21 (lifetime contract based in part on allegation that company would not be sold); McKinnon Dep., Vol. II, pp. 12-13 (allegations of lifetime contract based on alleged representations that company would not be sold); Mills Dep., Vol. II, pp. 16-17 (allegations of lifetime contract based on alleged representations that company would not be sold); Moorehead Dep., Vol. II, pp. 21-22 (allegations of lifetime contract based on alleged representations that company would not be sold); Padgett Dep., Vol. II, pp. 28-29 (allegations of lifetime contract based on alleged representations that company would not be sold); Robertson Dep., pp. 25-27, 56-58, 146 (never told had a lifetime contract); Welch Dep., pp. 128, 158 ("lifetime contract" never stated; relies on alleged representation that company would not be sold to support lifetime employment allegation).

terminate this employment relationship at any time for any or no cause."[47]

Summary judgment is due to be granted on the plaintiffs' breach of contract claim in Count I for two reasons. First, the plaintiffs were at-will employees of SCES, and thus there can be no breach of contract concerning the duration of their employment under the present circumstances. Second, even if the plaintiffs had a "lifetime contract" of employment, the undisputed evidence shows that there was no breach of such a contract.

### A. Plaintiffs Were At-Will Employees

Although the plaintiffs assert that "[f]or summary judgment purposes, there is no dispute that inducing an employee to accept a job offer with *SCES* and *PowerCall* on the premise that *PowerCall* would not be sold became part of the employment contract between each plaintiff and *SCES*" (Plaintiffs' Contract Brief at 2 (doc. 107)), such a conclusion is incorrect. Whether any alleged statements became part of or established employment contracts is the crux of the defendants' summary judgment motion. While statements of fact are construed in the light most favorable to the plaintiff for summary judgment purposes, legal arguments must be supported with appropriate legal authority. A mere conclusory statement does not establish a legal conclusion.

Contrary to what the plaintiffs urge the court to accept, the plaintiffs' breach of contract claim with regard to their loss of employment due to the sale of PowerCall fails because the evidence shows that, at all times, the plaintiffs were at-will employees of SCES. Alabama law is clear that at-will employees have no claim for breach of any employment contract.

Although the plaintiffs assert "that the written material were [sic] furnished after the employment agreement had been reached" (Plaintiffs' Contract Brief at 8) (emphasis in original),

---

[47] *See* DX 3, 31, 70, 84, 97, 137, 246, 271, 283, 294, 317, 339, 350, 365, & 394.

as stated previously, each offer letter included the at-will employment language.  In addition to the offer letters, the vast majority of the plaintiffs acknowledged through their signatures on their applications that their employment would remain at-will, and more importantly, that only an officer of the company could amend the at-will relationship through a written agreement between the company and the plaintiff.  Still further, the Intellectual Property Agreements and Confidentiality Agreements signed by the plaintiffs after they began employment define their employment, both present and future, as "employment at will."  Further again, the SCES Handbook stated that the plaintiffs' employment was at-will.  Finally, the Retention Agreements signed by the plaintiffs stated that their employment remained at-will.

Relying on Alabama law, the court in *Stutts v. Sears, Roebuck & Co.,* 855 F. Supp. 1574, 1582 (N.D. Ala. 1994) (Blackburn, J.) stated: "[T]o prove his claim of breach of contract, Plaintiff must show that the employment-at-will doctrine no longer applied and that a new contract existed."  To prove that the employment-at-will doctrine no longer applies, a plaintiff must establish the following: (1) a  clear and unequivocal offer of lifetime employment or employment of a definite duration; (2) the offer must be made by an agent with authority to bind the principal; and (3) the employee must provide substantial consideration for the contract separate from the services to be provided.  *Stutts*, 855 F. Supp. at 1584 (citing *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987)).  "[E]mployees in Alabama bear a heavy burden of proof to establish that an employment relationship is other than 'at will.'  The law considers lifetime or permanent employment contracts to be extraordinary and not lightly to be implied." *Howard v. Wolff Broadcasting Corp.,* 611 So. 2d 307, 310-11 (Ala. 1992).  Because the plaintiffs cannot meet their burden as to these three elements, they are at-will employees as a matter of law.

### 1. No clear and unequivocal offer of lifetime employment

The plaintiffs cannot overcome the summary judgment motion on their breach of contract claim because they cannot establish that they ever received a clear and unequivocal offer of lifetime employment. The plaintiffs allege that they were "led to believe" they had lifetime employment because they were allegedly told during pre-employment interviews and discussions that PowerCall would not be sold, that they would have a job as long as they performed their jobs, and/or they could retire from Southern Company (or words to this effect). None of these statements is sufficient under Alabama law to establish a clear and unequivocal offer of lifetime employment. *See Wright v. Dothan Chrysler Plymouth Dodge, Inc.,* 658 So. 2d 428, 430 (Ala. 1995) (statement that employment would last "as long as everything was smooth" and "there was no problem" was insufficient to establish a clear and unequivocal offer of lifetime employment); *Mullinax v. John's Wholesale Jewelry,* 598 So. 2d 838, 840 (Ala. 1992) (holding that the plaintiff's allegation that he was "led" to believe his employment would be permanent because he was told that if he benefitted the company there would be no problem with longevity was insufficient to establish a clear and unequivocal offer of employment); *Wesson v. The Huntsman Corp.,* 206 F.3d 1150, 1154 (11th Cir. 2000) (statement that if plaintiff went to work for employer that he "would always have a job," and that "as long as [the owner] had a company, [he] would have a job" did not constitute an unequivocal offer of lifetime employment); *Sanders v. Amerihealth, Inc.,* 898 F.2d 131, 132 (11th Cir. 1990) (statement by president that "as long as you do a good job for me, you've got a future with this company" did not constitute a clear and unequivocal offer of lifetime employment); *Chastain v. Kelly-Springfield Tire Co.,* 733 F.2d 1479, 1488 (11th Cir. 1984) (statement to the effect that the jobs were secure "as long as we did

our jobs and did not do anything against company policy" was insufficient to establish permanent employment where the terms "lifetime" or "permanent" were never used). *But see Green v. City of Hamilton, Housing Authority*, 937 F.2d 1561, 1564 (11th Cir. 1991) (allegations that the defendant's "Executive Director told him his employment would be 'permanent' and terminable only if he did something 'horribly bad' after six months of probation had passed" and the fact that the defendant's handbook clearly created contractual obligations is sufficient to raise a question of fact).[48]

### 2. The alleged statements were not made by an agent with authority

Even if the statements the plaintiffs heard amounted to unequivocal offers of lifetime employment, those statements could not modify the plaintiffs' at-will employment status because they were not made by an agent with authority to make such a modification.

As acknowledged by the plaintiffs in their applications for employment, and as stated in the SCES Employee Handbook, no one other than an officer could modify the at-will relationship and such modification must be contained in a written agreement between the plaintiff and the company. Any other attempt to modify the plaintiffs' at-will status was not authorized or binding. Moreover, the SCES Employee Handbook states that management does not have discretion to modify the employment-at-will status and that any company recruiting materials and other company documents cannot modify the at-will relationship.[49] (Roberts Decl., Ex. A, pp. 1.1 & 19.1). The statements by an Area Manager or local supervisor could not alter the plaintiffs'

---

[48] *Green* is factually distinguishable because the written materials in this case are clear that the employment relationship was "at-will" and not permanent.

[49] Thus, the plaintiffs' reliance on the customer marketing card, which states in part that a sale is "not an option" and "most existing [companies] are for sale now," is misplaced. DX 7. The marketing card could not modify the at-will status of those plaintiffs who were allegedly shown the card during their interview process.

at-will employment status. The record demonstrates that the plaintiffs were adequately informed that only a corporate officer could modify the employment relationship.

In *Stutts,* the plaintiff signed an acknowledgment of his status as an employee at will that stated that no one other than a president or vice-president could alter the at-will status. The court concluded that the employee's breach of contract claim could not be maintained, in part, because the acknowledgment "explicitly limited the power to change [the employee's] status. Thus, he could not reasonably have believed that the manager of the store, who was neither a vice-president nor a president, had the power to bind [the employer], the principal." *Stutts*, 855 F. Supp. at 1584.

The same is true in this case. No one other than an officer using a written agreement had authority to bind the company to lifetime or permanent employment. No plaintiff has alleged that an officer of the company made any written promises that they would have a job with the company as long as they performed their jobs or that they could retire from Southern Company. In fact, the only individuals whom the plaintiffs claim made pre-employment representations concerning the possible sale of the company or the duration of their employment were former Area Manager Rodney Kimbrell, former Lead Technician/Installation Supervisor Karen Coniff, Area Manager Gerald Williams, former Commercial Installation Supervisor David Entrekin, and some of the other plaintiffs.

The law in Alabama is clear: "Apparent authority is such authority as a principal knowingly permits an agent to assume or holds him out as possessing, and is based upon the principal's conduct, not that of the agent." *Masters v. Cobb*, 431 So. 2d 540, 541 (Ala. 1983). The plaintiffs have produced no evidence that SCES knowingly permitted Coniff, Wilson, Entrekin, Kimbrell, Williams, or any other employee to assume the authority to enter into a

lifetime contract of employment or that SCES engaged in any conduct which would suggest that they had this authority.[50]

The plaintiffs suggest that the marketing card or flyer and the "oral presentations" that some of the plaintiffs were allegedly required to give to customers "underscores the actual and apparent authority of the speakers at issue." (Pl. Contract Brief at 6-7). This argument is insufficient because it focuses solely on the behavior of the agents, not the principal. According to the plaintiffs' deposition testimony, the plaintiffs were directed by Coniff, Wilson, Entrekin, Kimbrell, and Williams to reassure customers about the possible sale of PowerCall. What the plaintiffs fail to explain is how these actions of the agents after the plaintiffs had come to work for SCES demonstrate that these agents had apparent authority to enter to contracts of lifetime employment. The plaintiffs have not pointed to any evidence that Sherrill or Roberts (i.e., the principals) were aware that these lower-level supervisors (i.e., the agents) were directing some plaintiffs to tell customers particular things about the sale of PowerCall. The plaintiffs also have not explained how a lower-level supervisor's explicit instructions to tell customers that PowerCall was not for sale could constitute evidence that that supervisor had apparent authority to enter into a lifetime contract of employment.

The plaintiffs also suggest that the "fact" that these lower-level supervisors "hired so many to lifetime contracts, establishes that upper management knowingly permitted these individuals to assume they had such power, thus giving them apparent authority to bind PowerCall to lifetime employment contracts." (Pl. Contract Brief at 9). As noted by counsel for the defendants, this

---

[50] The court specifically finds the plaintiffs' allegation that "[t]he individuals who made the representations to the [p]laintiffs were the highest ranking officials with whom the plaintiffs dealt," insufficient to overcome the motion for summary judgment. (Pl. Contract Brief at 6).

argument is completely circular.  The plaintiffs in essence are arguing that the fact that the agents

engaged in certain conduct establishes that they had the apparent authority to engage in such

conduct.  Again, however, the plaintiffs have failed to produce any evidence that upper

management knew that these lower-level supervisors allegedly were making statements about

employment prospects or retirement to the plaintiffs, much less allegedly entering into lifetime

contracts of employment with the plaintiffs.

In making these arguments, the plaintiffs fail to refute the evidence that these supervisors

could not have had even the apparent authority to enter into a lifetime contract of employment

because the plaintiffs were provided with adequate amounts of written material explaining that

their employment was at will.  Additionally, as already noted, the plaintiffs' employment

applications and the SCES Employee Handbook that the plaintiffs acknowledged that they

received explicitly stated that no one other than an officer of the company has the authority to

modify their at-will employment status, and that any such modification must be in writing.  (Def.

Contract Brief at 36-38).  Thus, any alleged oral statements by supervisors or managers could not

alter the plaintiffs' at-will employment status.

### 3. No consideration separate from the services to be rendered

As also stated above, a plaintiff must have provided consideration separate from the

services to be performed in order to support a contract for employment other than at-will.  The

plaintiffs have not established that they provided such consideration.[51]  While the plaintiffs argue

---

[51] As noted by the defendants, the lack of consideration is highlighted by a few examples.  Bess was unemployed at the
time he accepted his offer to work at PowerCall, and PowerCall was his "only option" for employment.  (Bess Dep., pp. 29-34).
The same is true for Mills.  (Mills Dep., pp. 16-17, 21).  Walther was terminated by Security Link, his previous employer, prior
to accepting employment with PowerCall.  (Walther Dep., pp. 29-32).  Prior to accepting employment with PowerCall, Rickels
was unable to work in the security business due to a covenant not to compete, and therefore he was selling phones as part-time

(continued...)

34

that they established this element because "virtually each relinquished another employment opportunity," (Pl. Contract Brief at 7), a number of the plaintiffs have offered no evidence that would support such a contention.[52]  Those plaintiffs have not met their burden of establishing all three elements for modification of their at-will employment into lifetime or permanent employment.[53]  Therefore, there can be no breach of contract action relating to any alleged promise for future employment.  *See Wade,* 994 F. Supp. at 1377 ("[E]ach plaintiff was an employee-at-will of defendant and plaintiffs have no claim for breach of any employment contract.").  Accordingly, summary judgment is due to be entered on Count I of those plaintiffs' claims in the second amended complaint.

## B. Even If "Permanent" or "Lifetime" Employment Contracts Existed, There Has Been No Breach

Even assuming *arguendo* that the plaintiffs established that they had lifetime or permanent

---

[51](...continued)
employment. (Rickels Dep., pp. 34-41).  These plaintiffs did not give up substantial employment in order to accept employment with PowerCall.

[52] By way of example, the plaintiffs' contract brief concerning Burkhalter and Wilson does not mention that they "relinquished another employment opportunity," (*see* Pl. Contract Brief at 7, 9-11, 21-22).  Childers is another example.  The plaintiffs' contract brief states that "[a]fter [Childers] discovered that PowerCall was being sold, [he] went and applied for a lineman position at the Southern Company." (*Id.* at 13).  However, it then notes that Childers failed a portion of the physical abilities test.  Thereafter, he accepted a position with Pro One which limited his ability to seek work with Southern Company. (*Id.*).  In contrast, McKinnon, Robertson, Rickels, Walther, Welch, Bray, Brookshire, Davidson, Hardy, Moorehead, and Padgett state that they did leave positions with other companies to go with PowerCall premised on representations of the defendants. (*Id.* at 14, 16, 23-24, 25, 30, 32, 35, 37, 54).  Rickels, Brookshire, Davidson, Bess, Maldon, and Padgett state that they abandoned other career opportunities based on the representations. (*Id.* at 22, 33-34, 36, 42, 44, 56).  Burkhalter states that he "had a definite job offer from another entity within the Southern organization." (*Id.* at 18).  Hardy states that he knew of other available positions with Southern Company including "meter readers, helpers, linemen and other positions." (*Id.* at 38).  Henley specifically states that she did not look for other work because of the representations. (*Id.* at 40).  McClinton states she failed "to take advantage of other career opportunities that were available to her." (*Id.* at 51).  Mills and Moorehead state that they failed "to take advantage of other career opportunities that were available to [them] at the time" because of the representations. (*Id.* at 53, 55).

[53] Moreover, even if plaintiffs could satisfy the elements of a lifetime contract as a result of alleged statements and representations made at the time they interviewed for employment, such contract was modified back to an at-will relationship through the subsequent agreements signed by plaintiffs, including the Intellectual Property Agreements, the Confidentiality Agreements, and the Retention Agreements -- all of which state that plaintiffs' employment was at-will.  There can be no dispute that plaintiffs were at-will employees at the time their employment ended.

employment contracts with SCES, there has not been a breach of any such contracts. "'Permanent employment' is defined as employment that is guaranteed so long as the employer is engaged in the same kind of business and needs the service of the employee performing it . . . ." *Aldridge v. DaimlerChrysler Corp.*, 809 So. 2d at 785, 793 (Ala. 2001). After the sale of the assets of PowerCall, SCES no longer was engaged in the security business and it, therefore, no longer needed the plaintiffs' services. (Sherrill Decl., ¶ 29).

In *Phillips v. Amoco Oil Co.*, 614 F. Supp. 694 (N.D. Ala. 1985), *aff'd*, 799 F.2d 1464 (11th Cir. 1986), a case factually similar to this case, the court held that even if there was an offer of permanent employment to the plaintiffs, there was no breach of the contract because the employer ceased operating the business unit which employed the plaintiffs. The court therein further rejected the plaintiffs' argument that there was a contractual duty to transfer the plaintiffs to another division of the company. The court stated in part as follows:

> In the present case, it is undisputed that Amoco sold its retail LPG business to Norgas, and abandoned the retail LPG business in Alabama. Prior to the sale, the various plaintiffs had held positions . . . in various retail sales branches of Amoco's LPG operations. After the sale, it is uncontroverted on the record that Amoco no longer engaged in the retail sales of liquid propane, and no longer needed the services the plaintiffs had been hired to perform. This being so, . . . as a matter of law. . . Amoco is entitled to summary judgment on the plaintiffs' claims for breach of lifetime employment contracts. Even assuming that such contracts were made, they were not breached, since they terminated as a matter of law when Amoco left the retail LPG business in Alabama. [citation omitted].

> The plaintiffs attempt in vain to escape the burden of the long line of precedents mandating this result. First, the plaintiffs argue that Amoco still does some business in Alabama, and that even after leaving the business of retail sales of liquid propane, Amoco was under a contractual duty to transfer the plaintiffs to some other type of work in some other division of Amoco's operations. . . . The plaintiffs labor against the current. Under Alabama law, a lifetime employment contract lasts only so long as the employer remains in the particular business for which the particular employee was hired. . . . Thus, in order for the principles in

36

> [Alabama law] to apply, it is not necessary that the employer go out of business totally. Rather, it is sufficient that the employer is no longer engaged in the business for which the particular employee is hired, and thus no longer in need of the particular services the employee was hired to perform.[54]

*Id.* at 700-01. *See Bates v. Jim Walter Resources, Inc.*, 418 So. 2d 903, 906 (Ala. 1982) (holding that trial court properly determined that employer no longer needed services of plaintiff as a result of a hiring freeze and therefore plaintiff did not have a breach of contract claim). As SCES's conduct did not constitute a breach of any alleged "lifetime contract" of employment (even if such a contract existed), summary judgment on Count I of the plaintiffs' second amended complaint is proper.

## II. COUNT II: BREACH OF CONTRACT - ALLEGED PROMISE THAT BENEFITS AT PRO ONE WOULD BE THE SAME

In Count II of the Second Amended Complaint, the plaintiffs allege a breach of contract against defendant SMD as a result of alleged statements that the benefits at Pro One, or the purchasing company, would be the same, similar or comparable as those available to PowerCall employees at SCES. Because the plaintiffs failed to respond to the defendants' arguments on this point (*see* Pl. Contract Brief), the court deems this count abandoned. In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Id.*; *see also Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (Where the plaintiff failed to respond to the defendant's summary judgment arguments on a claim, the Court deemed such

---

[54] In affirming the district court's grant of summary judgment to the defendant, the Eleventh Circuit stated as follows: "[E]ven where a life-time employment contract is legally enforceable, Alabama law provides that the contract remains in effect only as long as the employer remains in the business for which the employee was hired and needs the particular services the employee was hired to perform." *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1468 (11th Cir. 1986).

claim abandoned).

Nonetheless, the court would have granted summary judgment on this count for the following reasons: (1) this state law breach of contract claim is preempted by ERISA; (2) the plaintiffs' benefits were at-will and could be terminated at any time; and (3) the plaintiffs did not provide any consideration for the alleged promise.[55]

## A.  The Breach of Contract Claim Is Preempted by ERISA

The plaintiffs' Alabama common law claims relating to alleged representations regarding the benefits available at the purchasing company (Pro One) are preempted by ERISA because they relate to employee welfare or retirement benefit plans maintained by SCES and Pro One.[56] ERISA preempts "any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." 29 U.S.C. § 1144(a)(emphasis added).  The Supreme Court has repeatedly made it clear that the preemption provision of ERISA [29 U.S.C. § 1144(a)] is extremely broad.  *See, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987) (ERISA preempts breach of contract, tortious breach of contract and emotional distress claims related to the denial of benefits); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983) ("the breadth of [§ 1144(a)'s] preemptive reach is apparent. . ."); *see also Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.*, 57 F.3d 1040, 1042

---

[55] While it is unnecessary for purposes of ruling on the summary judgment motion to undertake an analysis of the plaintiffs' claims where they have been abandoned, because the court is aware that the plaintiffs are no longer represented by counsel, it elects to do so for the sake of clarity and completeness.

[56] This preemption analysis is equally applicable to plaintiffs' state law claims of fraud and misrepresentation concerning benefits (a portion of Count III) and common law breach of fiduciary duty (Count IV).  *See Lee v. E.I. DuPont de Nemours and Co.*, 894 F.2d 755, 758 (5th Cir. 1990) ("Whether the state action sounds in tort or contract *per se* is irrelevant to the issue of ERISA preemption.").

(11th Cir. 1995) (fraud and misrepresentation claims preempted); *Brown v. Connecticut Gen. Life Ins. Co.*, 934 F.2d 1193, 1196 (11th Cir. 1991) (state law claims for benefits are converted to federal claims through ERISA "super preemption"); *First National Life Ins. Co. v. Sunshine-Jr. Food Stores, Inc.*, 960 F.2d 1546, 1549-50 (11th Cir. 1992) (claims of breach of contract, breach of duties of good faith and fair dealing, willfulness, wantonness, misrepresentation preempted), *cert. denied*, 506 U.S. 1079 (1993); *Amos v. Blue Cross-Blue Shield of Alabama*, 868 F.2d 430 (11th Cir. 1989), *cert. denied*, 493 U.S. 855 (1989).

ERISA also governs any alleged misrepresentation about future benefits. *See generally Lee v. E.I. DuPont de Nemours & Co.*, 894 F.2d 755, 758 (5th Cir. 1990) ("We see no valid basis for such a difference in preemption treatment.  The fact that the [benefits] program was not adopted until after the plaintiff's retirement is irrelevant to this suit's character as an action that relates to a former employer's pension plan and interferes with the exclusively federal regulatory scheme."); *Vartanian v. Monsanto Co.*, 14 F.3d 697, 702 (1st Cir. 1994) (claim by former employee regarding alleged misrepresentations by former employer about whether a plan would be implemented in the future actionable under ERISA).

In this instance, the plaintiffs' breach of contract claim in Count II relates to employer-sponsored benefits plans that are governed by ERISA. (Janis Williams Decl., ¶¶ 4, 21). Specifically, the plaintiffs allege that SMD breached an oral contract regarding the level of benefits those plaintiffs would have at their subsequent employer.  The plaintiffs claim that Sherrill's alleged statements regarding benefits at Pro One created a contract to provide comparable, equal or the same benefits they were receiving as employees of SCES. (*See* Second Am. Compl. ¶¶ 201-03).  The plaintiffs claim this oral contract has been breached because the

benefits at Pro One are not comparable or the same. (*See* Second Am. Compl. ¶¶ 201-03). At its core, this is an ERISA claim because (1) the plaintiffs have asserted claims relating to ERISA-governed benefit plans, (2) the plaintiffs are essentially seeking to recover benefits defined by Southern Company's ERISA-governed benefit plans, and (3) the plaintiffs have explicitly asserted a claim under ERISA concerning the same alleged misrepresentations.

### 1. Plaintiffs' state law claims relate to ERISA-governed benefit plans

Several courts have addressed whether a state law claim arising from oral promises regarding the level of benefits at another company are preempted by ERISA. These cases have uniformly held that such claims are preempted. *See, e.g., Olson v. General Dynamics Corp.*, 960 F.2d 1418 (9th Cir. 1991), *cert. denied*, 504 U.S. 968 (1992); *Phillips v. Amoco Oil Co.*, 614 F. Supp. 694 (N.D. Ala. 1985), *aff'd*, 799 F.2d 1464 (11th Cir. 1986); *Thrailkill v. Amsted Indus., Inc.*, 102 F. Supp. 2d 1129 (W.D. Mo. 2000); *accord Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024 (11th Cir. 1997) (ERISA preempts state law claim that plaintiff was fraudulently induced to leave her prior employment based on representations that her disabled husband would receive same level of medical coverage with new employer); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290 (5th Cir. 1989) (preempting state law claims arising from representations by Goodrich that plaintiff would receive same retirement benefits if he left employment and became an independent franchisee).

*Phillips* is directly on point. The plaintiffs therein sued their current and former employers alleging that at the time the company was sold, the defendants failed to disclose the true terms of retirement benefits at the buyer's company. The court held that the state law claims were preempted by ERISA because "the thrust of these claims is the failure to accurately report or

40

disclose the terms of the Norgas [buyer] benefit plan and the plaintiffs' benefit rights following

the sale. Thus, it hardly can be disputed that, insofar as state law fraud principles are relevant

here, they relate to the administration of an employee benefit plan governed by ERISA and are

thus preempted." *Phillips*, 614 F. Supp. at 608.

*Thrailkill* is also similar in that the court found ERISA preemption because the plaintiffs

were essentially suing over a failure to disclose complete and accurate information regarding an

ERISA-governed plan during the negotiations of the sale of the company that employed the

plaintiffs. *Thrailkill*, 102 F. Supp. 2d 1129. The court in that case found that ERISA "provides

the exclusive remedy" for claims regarding the defendants' explanation of how a sale of the

company would affect ESOP benefits. *Id*. at 1133.

In *Olson*, the court held that ERISA preempted state law claims regarding alleged

misrepresentations about the level of benefits at a subsequent employer. In this case, Amex

purchased General Dynamics. Just prior to the sale, executives from both companies met with

General Dynamics' employees and the following statement was made: "I commit to you that in no

way will you be injured. On the bottom line, you will be equal or better to [sic] your present

position." *Olson*, 960 F.2d at 1420. The plaintiff subsequently discovered that his retirement

benefits at Amex were less than they would have been at General Dynamics. Accordingly, he

sued alleging that the statement made in the meeting just prior to the sale was a misrepresentation

regarding the comparability of the benefits at the new company. The court stated:

> Given the Supreme Court's directive that ERISA's preemption provision is to be
> construed broadly, it is difficult to see how Olson's fraud claim could be found not
> to "relate to" an employee benefit plan. We think that the district court's
> conclusion that Olson's allegations "relate to" an employee benefit plan are a
> straightforward application of the standard established by the Supreme Court. To

41

state his claim in the most favorable manner, Olson is alleging that upon
retirement, he received benefits from Amex and SAIC that were "considerably
less" than the benefits Amex and General Dynamics led him to believe he would
receive. The district court ruled that this is a claim "that he should be receiving a
level of benefits which he is not." Concluding that such a claim "has a connection
with" and makes a "reference to" a benefit plan, the judge ruled that the state law
fraud claim is preempted by ERISA.

*Id.* at 1421.[57]

The plaintiffs' claims in this case are sufficiently analogous to those in *Phillips, Thrailkill,*

and *Olson* to provide direction in this case. In each instance, the plaintiffs are suing to recover the

difference between benefits they would have been entitled to under the previous employer's

benefit plans. Therefore, just as the state law claims in *Phillips, Thrailkill,* and *Olson* were

preempted by ERISA, the plaintiffs' state law claims (including their breach of contract claim,

fraud claim, and breach of fiduciary duty claim) are preempted in this case.

### 2. Any determination of damages sought by the plaintiffs is inseparably connected to and references ERISA-governed benefit plans

Preemption also exists because the ERISA-governed benefit plans at issue in this case are

inseparably connected to any determination of damages. In *Phillips,* the Eleventh Circuit agreed

with the district court's determination that the state law claims were preempted because the

plaintiff defined his damages in terms of benefits:

We agree with the district court that the particular fraud claim raised by the
employees in this case is preempted by ERISA. The action alleged by the
employees to have been fraudulent was the failure to disclose the terms of the
Norgas benefit plan. The claim depends on an interpretation of the fiduciary duties
imposed by ERISA. The claim also runs directly into ERISA's disclosure
provisions. The compensatory damages specifically sought by the employees for
the fraud claim are "compensatory damages in the form of a loss of employee

---

[57] In concluding that the plaintiff's claim was preempted, the Ninth Circuit relied on the Eleventh Circuit's decision in
*Phillips.* 960 F.2d at 1423.

> benefits, including but not limited to, the value of the following benefits: early retirement, retirement, life and health insurance, vacation and savings plan benefits . . ." Pretrial Order at 17. **This request for damages demonstrates that the employees' fraud claim not only 'relates to' an employee benefit plan but is at its core an ERISA claim**.

*Phillips*, 799 F.2d at 1470 (emphasis added).

As in *Phillips*, the plaintiffs in this case describe their potential damages in terms of lost benefits. By interrogatory, the defendants propounded the following question: "Identify with specificity and particularity each and every element and item of damages (including monetary amounts) that you contend you are entitled to recover from the defendants, and explain how each item of damages was calculated." (*See* Def.'s First Set of Interrog. at No. 13). In identifying actual damages, the plaintiffs listed lost ERISA-governed benefits.[58] If the plaintiffs were to recover, they would undoubtedly measure their alleged damages by the difference in value between the benefits they were receiving during their employment at SCES and the benefits they later received at Pro One. Therefore, the plaintiffs recognize that the provisions of the Southern Company and Pro One benefits plans provide the measure of damages, and these plans must be referred to in order to determine the amount of their damages.

It is well-settled that ERISA governs determinations that require reference to an ERISA-governed plan. *See Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.*, 57 F.2d 1040 (11th Cir. 1995) ("where state law claims of fraud and misrepresentation are based upon the failure of a covered plan to pay benefits, the state law claims have a nexus with an ERISA plan and its benefits system"); *Bishop v. Osborn Transp., Inc.*, 838 F.2d 1173 (11th Cir.), *cert.*

---

[58] *See* DX 27, 45, 65, 81, 94, 132, 144, 213, 262, 277, 289, 310, 332, 346, 362, 390, 401, 419, 438, 526; *see also* Second Amended Complaint at Count II.

*denied*, 488 U.S. 832 (1988) (Plaintiff's remedy, if any, under ERISA's civil enforcement provisions is limited to benefits due under the terms of the plan); *Howard v. Parisian*, 807 F.2d 1560 (11th Cir. 1987); *Barr v. American Cyanamid Co.*, 808 F. Supp. 752 (W.D. Wash. 1992) (ERISA preempts state law claims when plaintiff requests as damages, among other things, the amount of benefits lost).

In this case, the terms of ERISA-governed plans would have to be referenced to determine the measure of benefits, if any, the plaintiffs are owed. The entire basis of the plaintiffs' allegations are premised on the existence of ERISA-governed benefit plans; if the plaintiffs' claims are removed from this context, their claims would make no sense. Accordingly, the court finds that the plaintiffs' claims are preempted.

### 3. The plaintiffs have asserted ERISA claims arising out of the same alleged misrepresentations

Finally, the plaintiffs admit that their state law claims have a connection to or relate to ERISA-governed benefits plans, inasmuch as they also allege violations of ERISA based on the same nucleus of facts that underlie their state law claims. Specifically, in Count VII of their Second Amended Complaint, the plaintiffs allege that SMD breached a fiduciary duty under ERISA "by failing to be truthful about employee benefits." (Second Am. Comp. at ¶ 254). This fiduciary claim arises out of the same alleged misrepresentations concerning benefits as the plaintiffs' breach of contract claim in Count II, their fraud claim in Count III, and their common law breach of fiduciary duty claim in Count IV.

"[S]tate common law and statutory claims which arise out of the same underlying facts as [an ERISA claim] are preempted." *Hoover v. Blue Cross & Blue Shield of Alabama*, 855 F.2d

44

1538, 1541 (11th Cir. 1988) (ERISA preempts state law claims related to same factual basis as ERISA breach of fiduciary duty claim in complaint); *see also District 65 Retirement Trust for Members of the Bureau of Wholesale Representatives v. Prudential Securities*, 925 F. Supp. 1551, 1562 (N.D. Ga. 1996). Thus, all of the plaintiffs' state law claims concerning misrepresentations about the employee benefits at Pro One are preempted by ERISA.

Given the Supreme Court's directive that ERISA's preemption provision is to be construed broadly, the plaintiffs' state law claims "relate to" ERISA-governed benefits plans. Accordingly, summary judgment is due to be granted on the plaintiffs' breach of contract claim enumerated in Count II of the Second Amended Complaint.

### B.   Plaintiffs' Benefits Were At-Will

The defendants next assert that even if the plaintiffs "could elude ERISA preemption (which they cannot), their breach of contract claim concerning representations about their benefit is without merit because they have not been injured." They again assert that the plaintiffs were employees at-will during the relevant time. As previously noted, "[t]he right to terminate an employee whenever the employer chooses necessarily includes the right to change the conditions of employment," including the plaintiffs' benefits. *Stutts*, 855 F. Supp. at 1584. As also noted, the plaintiffs in this matter were repeatedly were informed that their benefits could be terminated at any time.

Because the plaintiffs' benefits could be amended or terminated at any time, they did not suffered an injury as a result of any representations concerning their future benefits. *Stutts*, 855 F. Supp. at 1582-1583. *See also Coleman v. General Electric Co.*, 643 F. Supp. 1229, 1236 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987) ("Since 3M was free to terminate the employees at

45

the completion of its sale of the going concern, and since the benefits at issue were contingent, a misrepresentation is immaterial because the plaintiffs have not been damaged in any manner.").

### C.     No Consideration Was Provided

The defendants further assert that the plaintiffs' breach of contract claim is also due to be dismissed because the plaintiffs provided no consideration in exchange for an alleged promise that their benefits would be the same, similar or comparable after the sale. The defendants are correct in their assertion that continuing employment with SCES is insufficient. The Alabama Supreme Court has stated that the "services to be rendered" in continued employment are not adequate consideration. *Hoffman-La Roche,* 512 So. 2d at 728.

## III. COUNT III: FRAUD CLAIM - ALLEGED PROMISE NOT TO SELL THE COMPANY

In Count III, the plaintiffs assert fraud and misrepresentation claims against all three defendants because they allege that they were told that the company would never be sold.[59] Because the alleged representation -- that the company will not be sold -- relates to a future event, the plaintiffs are asserting a promissory fraud claim. *Wade v. Chase Manhattan Mortg. Corp.,* 994 F. Supp. 1369, 1379 (N.D. Ala. 1997) ("Statements asserting that a person will be given a particular job . . . at some future time are allegations of promissory fraud because the representation is a promise to take action in the future."); *National Security Ins. Co. v. Donaldson,* 664 So. 2d 871, 876 (Ala. 1995) (promise that plaintiff would be promoted following the retirement of another employee and plaintiff would have permanent employment were promissory

---

[59] Count III of the Second Amended Complaint alleges fraud and misrepresentation based upon two different sets of allegations -- the alleged promise not to sell the company and the alleged statement that benefits would be comparable or the same at the purchasing company. For the sake of clarity, these two sets of fraud claims will be addressed separately in Sections III and IV of this Opinion, respectively.

fraud allegations).

The elements of promissory fraud are: (1) a false representation, (2) of an existing material fact, (3) that is justifiably relied upon, (4) damage proximately resulting from the reliance, (5) an intent not to perform at the time the misrepresentation was made, and (6) intent to deceive.  The failure to perform the promise does not by itself show intent not to perform at the time the promise is made.  *Wade,* 994 F. Supp. at 1378-79.  Moreover, a reckless misrepresentation alone is not enough to support a promissory fraud claim.  *National Security Ins. Co.,* 664 So. 2d at 876 ("recklessness alone is not enough to support a fraud claim of this sort").

Summary judgment is due to be entered on this portion of Count III for several reasons. First, the plaintiffs have produced no evidence that any of the individuals making the alleged representations intended to deceive the plaintiffs.  Second, any representations that might have been made were merely predictions, not misrepresentations.  Third, the plaintiffs' status as employees-at-will, whose employment could be terminated at any time, precluded them from reasonably relying on the alleged representations about the sale and prevented them from being injured by such representations.  Fourth, some plaintiffs did not rely on the alleged representations to their detriment.

Although the defendants make cogent arguments, which the plaintiffs fail to rebut, that (1) no evidence of knowledge or intent to deceive exists, and (2) even if any plaintiffs did rely on any allegedly false statements, they did not do so to their detriment, their arguments that any alleged statements were mere predictions, not misrepresentations, and that the plaintiffs' at-will status precludes a fraud claim are sufficiently dispositive so that the court will not address their remaining defenses.  Summary judgment is due to be entered on Count III of the plaintiffs' second

47

amended complaint for a number of reasons that will be discussed in detail below.

### A. The alleged statements that PowerCall would not be sold were mere predictions, not misrepresentations

The alleged statements by SCES supervisory employees that PowerCall would not be sold were mere opinions or predictions of the future which are insufficient to undergird the plaintiff's fraud claim.  The plaintiffs consistently testified that the alleged statements were made to promote PowerCall and recruit them from other employers.  Such "promotional" or "recruiting" pitches are insufficient as a matter of law.  In *Wade v. Chase Manhattan Mortg. Corp.*, 994 F. Supp. 1369 (N.D. Ala. 1997), relying on Alabama law, the court held that pre-employment promises regarding the plaintiffs' terms and conditions of employment were mere opinions or predictions and could not support the basis of a fraud action.  The court stated in part as follows:

> Generally a plaintiff's claim of misrepresentation cannot be based on the expression of an opinion or a prediction of the future.  "[S]tatements of opinion amounting to nothing more than 'puffery' or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act, and therefore, will not support a fraud claim."  *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 846 (Ala. 1993) (quoting *Fincher v. Robinson Bros. Lincoln-Mercury, Inc.*, 583 So. 2d 256, 259 (Ala. 1991); *see also Crowne Investments, Inc. v. Bryant*, 638 So. 2d 873, 877 (Ala. 1994). . . .

> In this case plaintiffs described Kurilec's statements during the dinner in November as a "sales pitch" or motivational or recruiting presentation promoting the employment opportunities at Chemical. . . .  While a salesman cannot legally misrepresent actual facts in a presentation, statements that are simply opinions of the product's future performance or job's future opportunities cannot provide the basis for a fraud claim.

*Wade*, 994 F. Supp. at 1382.  The present situation is similar and, therefore, cannot serve as a basis for relief.

### B. Plaintiffs' at-will status preclude a fraud claim as there is no reasonable reliance or damage

Even if the court were to conclude that the statements were more than "puffery", the court has already determined that the plaintiffs were at-will employees, and, as such, they cannot show that they reasonably relied on, or were injured by, any alleged representations that the company would not be sold.

In *Salter v. Alfa Ins. Co., Inc.,* 561 So. 2d 1050, 1053-54 (Ala. 1990), the Alabama Supreme Court held that an at-will employee suffered no injury as a result of an alleged misrepresentation, stating in part as follows:

> The undisputed evidence in the present case shows that Salter suffered no injury as a result of any representation that may have been made by a representative of Alfa. Salter had an employment contract that was terminable by Alfa at any time and for any, or no, reason. Even assuming that Salter proved that Alfa, through one of its representatives, had intentionally or recklessly misrepresented to her that she did not have to participate at all in the investigation of the W.B. claim; that she had acted upon the misrepresentation; and that Alfa had based the termination of her contract on her failure to cooperate in the investigation, the fraud claim would still fail.

*See also Burrell v. Carraway Methodist Hospitals of Alabama, Inc.,* 607 So. 2d 193 (Ala. 1992) (holding that an at-will employee cannot maintain a fraud claim because "there can be no legally compensable injury resulting from the employer's terminating the employment").

Relying on the Alabama Supreme Court's decision in *Salter*, the court in *Stutts* held:

> The fact of employment at will raises a barrier to a fraud action by an employee because Alabama law also clearly establishes that in order to maintain a fraud action in an employment context, the plaintiff must show that he suffered actual injury. The element of actual injury is one that plaintiff cannot meet; since an employee at will may be terminated at any time for any reason or for no reason, he cannot show injury from the fact of changes in his employment, even if those changes are attributable to malicious action on the part of the employer. *Salter v.*

*Alfa Insurance Co.,* 561 So. 2d at 1053-54 (Ala. 1990).[60]

*Stutts,* 855 F. Supp. at 1582.  Further, the *Stutts* court held that the plaintiff could not have

reasonably relied on representations that his compensation would remain unchanged because the

plaintiff had acknowledged in writing that his compensation could be changed.  *Id.,* 855 F. Supp.

at 1583.

Similarly, in *Gardner v. State Farm Mutual Automobile Insurance Co.,* 822 So. 2d 1201

(Ala. Civ. App. 2001), *aff'd,* 822 So. 2d 1211 (Ala. 2001), the plaintiff, a discharged insurance

agent, sued State Farm and its affiliates for fraud.  The plaintiff claimed she had been told that she

would not be terminated except for theft, but her written agreement specified that her employment

was terminable at will.  Affirming summary judgment on the fraud claim, the Alabama Court of

Civil Appeals held that the plaintiff's reliance was unreasonable as a matter of law.  *Gardner,* 822

So. 2d at 1209.

The same is true in this case.  The plaintiffs could not reasonably rely on alleged oral

statements that led them to believe that their employment would continue forever because they

consistently acknowledged and agreed through writings that their employment was terminable at

will.[61]  Similarly, the plaintiffs could not be damaged by any such statements because their

---

[60] *But see Tolbert v. United Ins. Co. of Am.,* 853 F. Supp. 1374, 1377 (M.D. Ala. 1994) (holding that "fraud claims will lie if they involve matters which are collateral to the employee's status").  The alleged misrepresentation that PowerCall would never be sold is not collateral to the plaintiffs' employment status since the plaintiffs are alleging that they were entitled to lifetime employment as a result of the alleged statements.  *See Wade v. Chase Manhattan Mortg. Corp.,* 994 F. Supp. 1369, 1377 (N.D. Ala. 1997) ("In order for any such breach of contract to be actionable despite an at-will employment relationship, plaintiffs must show that these pre-employment promises constituted an agreement separate and distinct from the at-will employment relationship.").

[61] In *Foremost Insurance Co. v Parham,* 693 So. 2d 409 (Ala. 1997), the Alabama Supreme Court abandoned the "justifiable reliance" standard and returned to the reasonable reliance standard.  *See Ex parte Caver,* 742 So 2d 168, 172-73 (Ala. 1999) (*Parham* ended the era of "ostrichism" and "foreclosed the right of a person to blindly rely on an agent's oral representations or silence to the exclusion of written disclosures . . . .").  Under the reasonable reliance standard, a trial court must enter a judgment as a matter of law in a fraud case "where the undisputed evidence indicates that the party or parties

(continued...)

employment was at will and they could be terminated at any time. This factor alone precludes the plaintiffs' promissory fraud claim in Count III. Although this may seem harsh under the circumstances herein,[62] it is a consequence of the "at-will" nature of the plaintiffs' employment relationship with SCES.

For all of the above reasons, summary judgment is due to be granted on the plaintiffs' fraud and misrepresentation claims in Count III regarding the defendants' alleged promise not to sell the company.

## IV. COUNT III: FRAUD - ALLEGED PROMISE THAT BENEFITS WOULD BE COMPARABLE OR THE SAME

In Count III, the plaintiffs also allege fraud and misrepresentation against all the defendants based upon their allegations that they were told that the benefits at the purchasing company and/or Pro One would be the same, similar, or comparable to their benefits at SCES. Specifically, the plaintiffs allege that in the July 7, 2000, meeting Sherrill stated that PowerCall would only be sold to a company that had the same, similar, or comparable benefits. Then, in the November 2000 meeting, wherein it was announced that Pro One would buy the assets of PowerCall, the plaintiffs claim Sherrill stated that the benefits at Pro One were comparable. Because the alleged statements for which the plaintiffs rely relate to future events (*i.e.*, what the benefits would be at the purchasing company) the plaintiffs are again asserting promissory fraud.

---

[61](...continued)
claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms." *Parham*, 693 So. 2d at 421. Indeed, if oral representations are made that are subsequently disclaimed in a written document, a plaintiff's reliance on those representations is not reasonable as a matter of law.

[62] For instance, Childers and McKinnon left positions with other companies in June 2000 to go with PowerCall. Robertson left a position with another company in April 2000.

The defendants contend that the plaintiffs' promissory fraud claim concerning benefits cannot be maintained because (1) this state law claim is preempted by ERISA; (2) the plaintiffs' benefits were at will, and thus there was no reasonable reliance or injury; (3) the alleged statements were mere predictions, not misrepresentations; (4) the July 2000 statement was made without an intent to deceive the plaintiffs; (5) the plaintiffs did not reasonably rely on the July 2000 statement; (6) the plaintiffs did not reasonably rely upon Sherrill's November 2000 statement; and, (7) defendant Williams is not alleged to have made the alleged misrepresentations.

As the plaintiffs again fail to respond to the defendants' arguments, summary judgment is due to be entered on the plaintiffs' fraud claim as it relates to benefits. As already noted, a party may not rely on his pleadings to avoid judgment against him. *Resolution Trust Corp.*, 43 F.3d at 599. Nonetheless, the court would have granted summary judgment on this count for the reasons set out below.

### A. The Fraud Claim Is Preempted by ERISA

As discussed previously, ERISA preempts the plaintiffs' claims concerning the alleged statements regarding continued employments. The reasoning that applied to those claims applies to the plaintiffs' fraud claim concerning representations about the benefits as well.

### B. Plaintiffs' Benefits Were At-will and Thus There Was No Reasonable Reliance Or Damage

As discussed previously, the plaintiffs' at-will status relates not only to the duration of plaintiffs' employment, but also the terms and conditions of their employment, including their benefits. Because the plaintiffs' benefits could be terminated or altered at any time, there can be no fraud claim arising out of an alleged statement that their benefits would remain the same.

*Stutts*, 855 F. Supp. at 1584.  In accordance with the authorities discussed above, the plaintiffs have suffered no injury and they could not have reasonably relied on the alleged statements that their benefits would be the same or comparable.

### C. The Alleged Statements Regarding Benefits Were Mere Opinions and Vague Predictions

As also discussed previously, mere vague predictions or opinions cannot support a fraud claim.  *See Wade,* 994 F. Supp. at 1382.  Sherrill's alleged statements that the benefits at the purchasing company would be comparable or the same cannot be construed as a representation of a material fact.  As discussed in more detail below, in *Ames v. American National Can Co.*, 1997 WL 733893 at *15 (N.D. Ill. 1997), the court concluded that statements made to employees that benefits would be "very comparable" and "similar" with a purchasing company were "in the manner of general expressions of opinion, not actionable statements of material fact."  Similarly, in *Coleman v. General Electric. Co.,* 643 F. Supp. 1229, 1236 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987), the court concluded that statements that the benefits at a purchasing company were "equal to or better than the benefits" with the selling company were too vague to be actionable as fraud.  The court stated as follows:

> Two main problems exist with plaintiffs' claims.  First, statements made, or allegedly made, are too vague to be actionable. . . .  Plaintiffs seek to create a cause of action out of little or no substance.  For fraud or misrepresentation, there must be a misrepresentation and it must be reasonable to rely on such misrepresentation. . . .  The vague amorphous statements allegedly made are insufficient. . . .  There simply was no reason for plaintiffs to have relied on vague and generalized statements comparing the plans.

*Coleman*, 643 F.2d at 1236-37.  Moreover, the plaintiffs failed to produce any evidence other than unsubstantiated opinions that the benefits offered by Pro One are not comparable to those offered by SCES.

**D. The Alleged Statement in Early July 2000 Was Made Without Knowledge of its Alleged Falsity and Without Intent to Deceive**

As noted by the defendants, the record establishes that in July 2000, no one with SCES knew whether SCES would find a buyer for the assets of PowerCall, much less who the buyer would be. (Sherrill Decl., ¶ 5; Roberts Decl., ¶ 7). Thus, Sherrill could not have known in July 2000 what the benefits would be with the purchasing company, because the purchasing company had not been identified yet. Further, there is no evidence that SCES or Sherrill in July 2000 did not intend to sell the assets of PowerCall to a company that had the same, similar, or comparable benefits or that Sherrill intended to deceive the plaintiffs by making the alleged prediction. To the contrary, the evidence tends to show that Sherrill intended to sell PowerCall's assets to a company with comparable benefits. This evidence includes (1) his own sworn, uncontradicted testimony, (2) his inclusion of the comparable benefits requirement in the draft Asset Purchase Agreement sent to prospective purchasers, (3) his reliance upon Pro One's statements regarding benefits in their bid, and (4) his request that Pro One document its intent to gross up base salaries to account for any differences in benefits. (Sherrill Decl., ¶¶ 13, 20-22, Exs. D, E, G).

**E. Plaintiffs Did Not Reasonably Rely on the July 2000 Statement Regarding Benefits**

Several of the plaintiffs did not rely on the alleged statements that their benefits would be same, similar, equal, like or comparable with the purchasing company. Plaintiff Maldon was not present at the July 7, 2000, meeting, and therefore he could not have relied directly on the alleged statement or statements. (Maldon Dep., pp. 99, 103-04). Plaintiff Mills and others testified that in July 2000 they "knew" that Sherrill's alleged statement that the benefits at the purchasing company would be similar or equivalent was not true because there was no security company that

54

had similar or equivalent benefits.[63]  Specifically, Mills testified as follows:

> Q:   So all of [Sherrill's] comments about selling to a company with similar standards or equal or equivalent benefits didn't really matter to you?
>
> A:   Well, it did, but, I mean, he was standing up there saying that, but that didn't mean it was going to happen, because there wasn't anybody else, especially in the alarm business.  It had already been proved.
>
> Q:   What do you mean there wasn't anybody else?
>
> A:   Well, not – – any alarm company that had any kind of benefits like we had, we knew that.  Because a lot of the guys were from different companies, and that's the reason they came over there, so they could get the good benefits.
>
> Q:   So, when [they] said that they were going to try to sell the company to someone that had equal or equivalent benefits, y'all didn't believe them?
>
> A:   No.

(Mills Dep., pp. 58-59).  If Mills did not believe Sherrill when he made the alleged statement regarding benefits at the purchasing company, then Mills could not have detrimentally relied on such statement.[64]

In addition, some plaintiffs applied and did all they could do to find other employment despite the alleged misrepresentations.[65]  These plaintiffs therefore did not detrimentally rely on

---

[63]See Davidson Dep., p. 123 (does not know of any security companies that had "comparable" benefits to the Southern Company); Johns Dep., p. 85 (same); Moorehead Dep., p. 139 (same); Welch Dep., p. 74 (same); Walther Dep., pp. 45-46 (same); Wilson Dep., p. 170 (same); Hardy Dep., pp. 153, 163-64 (same).

[64] See also Hardy Dep., pp. 188-89 (does not know how life would be different had Sherrill stated that benefits would not be same or comparable); Mills Dep., pp. 100-01 (does not know what he would have done differently if Sherrill had stated that the benefits at the purchasing company would not be the same); Walther Dep., pp. 120, 155-56 (cannot say what he would have done differently had he been told that benefits were not comparable at purchasing company; he did not believe Sherrill's alleged statement that the benefits at Pro One were comparable).

[65] Childers Dep., pp. 123-24 (regardless of what he was told the benefits would be at purchasing company, he did all he could do to find job within Southern Company); McClinton Dep., pp. 219-20, 233-34 (nothing else she could have done to find another job); McKinnon Dep., pp. 62-67, 132 (after November meeting, he applied everywhere within and outside Southern Company; "hard to say" what he would have done had Sherrill stated that benefits would not be comparable or the same with purchasing company); Wilson Dep., p. 78 (attempted to find other employment after July meeting).

any alleged statements regarding benefits made in July 2000.

### F. Plaintiffs Did Not Reasonably Rely on the November 2000 Statement Regarding Benefits

The plaintiffs could not have reasonably relied on Sherrill's November 2000 alleged statement that the benefits with Pro One were comparable. As documented by plaintiff Charlotte Henley's notes at the November 2000 meeting, Sherrill told PowerCall employees that Pro One did not have a retirement or pension plan and that Pro One's 401(k) match was less than Southern Company's match. (Henley Dep., pp. 144-47, 152-53, 160-61, DX 105 p. 2; Sherrill Decl., ¶ 26). Further, plaintiff Walther announced to the entire audience that Pro One did not have a retirement plan. In addition, on November 21 or 22, 2000, each plaintiff received a Benefits Adjustment Illustration (prepared by Pro One) which listed the benefits that were available at Pro One.[66] Finally, copies of Pro One's plan documents were available at PowerCall's office for the plaintiffs to review. (Mills Dep., pp. 64-66). Accordingly, to the extent the plaintiffs allege that Pro One's benefits were not comparable due to the absence of a retirement plan and a lower 401(k) match, the plaintiffs could not have reasonably relied on Sherrill's alleged statement.[67] Summary judgment is, therefore, due to be granted on the plaintiffs' fraud and misrepresentation claims in Count III regarding the alleged promise that Protection One's benefits would be comparable or the same.

## V. COUNTS IV AND VII: FIDUCIARY DUTY CLAIMS

In Counts IV and VII of the Second Amended Complaint, the plaintiffs allege breach of

---

[66] Roberts Decl., ¶ 18; Janis Williams Decl., ¶ 15, *see also* notes 33-36.

[67] Moreover, at least two plaintiffs did not rely on Sherrill's alleged statement because they did not believe Sherrill. Maldon Dep., pp. 123-25 (based on information provided in November, he did not believe benefits were comparable); Moorehead Dep., p. 129 (stopped believing Sherrill in November 2000).

fiduciary duty claims under state law and ERISA, respectively.  The plaintiffs' fiduciary duty

claims arise out of their allegations that they were told that their benefits would be the same or

comparable and that PowerCall would not be sold.  Alabama has not recognized a breach of

fiduciary claim under the facts presented in this case.[68]  Even if such a state law claim existed, the

plaintiffs' fiduciary duty claim relating to benefits would be preempted by ERISA as discussed

previously.  Therefore, summary judgment is due to be entered on the state law fiduciary duty

claim raised in Count IV as a matter of law.

The defendants further argue, among other things, that both the state law breach of

fiduciary duty claim and the ERISA breach of fiduciary duty claim should also be dismissed

because (1) SCES was not acting as a fiduciary at the time the representations allegedly were

made and (2) there has been no breach of any fiduciary duty.  Because the court finds these

arguments persuasive, only they will be addressed herein.

### A.  SCES Was Not Acting as an ERISA "Fiduciary"

Under ERISA, a "person is a fiduciary with respect to a plan," and, therefore, subject to

ERISA fiduciary duties, "to the extent" that he or she "exercises any discretionary authority or

discretionary control respecting management" of the plan, or "has any discretionary authority or

discretionary responsibility in the administration" of the plan.  29 U.S.C. § 1002(21)(A).  "In

determining who is a fiduciary under ERISA, courts consider whether a party has exercised

discretionary authority or control over a plan's management, assets, or administration. . . .  If a

---

[68] State law claims for breach of fiduciary duty have been limited to principal-agency relationships, shareholder derivative suits, and cases involving realtors and appraisers in real estate transactions. *James A. Head & Co. v. Rolling*, 265 Ala. 328, 342, 90 So. 2d 828 (1956) (agent-principal relationship); *Cooper v. USCO Power Equip. Corp.*, 655 So. 2d 972 (Ala. 1995) (shareholder derivative suit); *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455 (Ala. 2000) (suit by purchaser against realtor and appraiser).

person's authority or control does not concern 'management', or 'plan assets', that person is not a fiduciary." *Confer v. Custom Engineering Co.,* 952 F.2d 34, 36 (3d Cir. 1991).

SCES was not acting as a fiduciary at the time statements were made regarding the benefits available at the purchasing company or Pro One. Therefore, no action lies for breach of fiduciary duty. The purpose of the July 2000 meeting was to inform employees that PowerCall was for sale. The purpose of the November 2000 meeting was to inform employees that Pro One was the purchaser. At these meetings, benefits were only discussed as one of several issues relating to the sale. (Sherrill Decl., ¶¶ 12-13, 25-26).

In *Varity Corporation v. Howe,* 516 U.S. 489, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996), the United States Supreme Court held that Varity breached fiduciary duties owed to its employees when it deliberately misled employees about the benefits that would be offered by its newly formed subsidiary in order to encourage employees to transfer to the newly formed subsidiary. *Id.,* 516 U.S. at 502. *Varity,* however, is distinguishable from this case. Varity was the plan administrator for both its plans and the newly formed subsidiary's plans. During a meeting in which employees were encouraged to transfer to the subsidiary, the key subject matter was the fact that their benefits would not change if they transferred to the subsidiary. The Court concluded, therefore, that Varity was wearing both its "fiduciary" hat and "employer" hat because it was acting as a plan administrator when making representations regarding the subsidiary's plans. *Id.,* at 498-503. The Supreme Court stated:

> We conclude, therefore, that the factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so, together provide sufficient support for the District Court's legal conclusion that Varity was acting as a fiduciary.

58

*Id.* at 503.

In this case, SCES was not the administrator of Southern Company's or Pro One's benefit plans and it did not exercise any management or other discretionary authority over Southern Company's or Pro One's benefit plans. It is undisputed that David Sherrill was not the Plan Administrator of any Southern Company or Pro One benefit plan. (Janis Williams Decl., ¶ 5, Sherrill Decl., ¶ 41). "[C]ourts have declined to ascribe a fiduciary duty with respect to another company's benefit plans." *Ames v. American National Can Co.,* 1997 WL 733893 *14 (N.D. Ill. 1997). *See Riley v. Murdock,* 890 F. Supp. 444, 449 (E.D.N.C. 1995), *aff'd,* 83 F.3d 415 (4th Cir. 1996) (language in stock purchase agreement did not transform buyer into a fiduciary with discretionary authority over plan administration).

In *Ames v. American National Can Co.,* 1997 WL 733893 (N.D. Ill. 1997), the court considered very similar issues to the ones presented in this case. In that case, American National Can Co. ("ANC") negotiated an asset sale of one of its divisions to another company, Silgan Containers Corporation ("Silgan"). The plaintiffs in that action were employees of the ANC division that was sold to Silgan. ANC provided the plaintiffs with a letter regarding the sale of the division that stated in part that:

> Silgan has agreed to offer compensation opportunity and employee benefits that are similar to those you currently have at ANC. The programs are not identical and individuals may be affected in different ways, but in the aggregate, the total value of the programs of the two companies is very comparable.

*Id.* at *5. The plaintiffs sued ANC for breach of fiduciary duty alleging that ANC had made misrepresentations with respect to the benefit plans at Silgan. The court distinguished *Varity* and granted summary judgment to ANC with respect to the fiduciary duty claim, holding:

> *Varity Corp.* does not govern this case. *Varity Corp.* examines fiduciary duty only in the context of a plan fiduciary's obligation not to affirmatively mislead. Varity Corporation was both the employer and the plan administrator. *Id.* at 1071. In contrast, defendants here are not plan administrators of Silgan's benefit plans. Nor can defendants be considered Silgan fiduciaries by virtue of any discretionary authority or control.

*Id.* at *15.

The court in *Ames* relied in part on *Coleman v. General Electric Co.,* 643 F. Supp. 1229, 1236 (E.D. Tenn. 1986), *aff'd,* 822 F.2d 59 (6ᵗʰ Cir. 1987). The plaintiffs in *Coleman* were part of a corporate division that was sold to another company. They filed suit against the seller and the buyer. The plaintiffs sued the seller under ERISA alleging a breach of fiduciary duty based on alleged misrepresentations that the buyer's benefits would be "equal to or better than the benefits" provided by the seller. *Id.* at 1232. The court concluded that the seller was not a fiduciary under ERISA. *Id.* at 1238-39. *See also Phillips*, 799 F.2d at 1464 ("[T]he fiduciary duty provisions of ERISA are not implicated in the sale of a business or a portion of a business merely because the terms of the sale will affect the terms and conditions of contingent future retirement benefits. . . . ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets."); *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6ᵗʰ Cir. 1998) ("[C]ourts have typically distinguished between employer actions that constitute 'managing' or 'administering' a plan and those that are said to constitute merely 'business decisions' that have an effect on an ERISA plan; the former are deemed 'fiduciary acts' while the latter are not.").

Premised on the record before the court, it is evident that SCES was not acting as a "fiduciary" with respect to Pro One's plans or Southern Company's plans when Sherrill allegedly

made statements regarding the benefits at Pro One.  Accordingly, the defendants' motion for summary judgment is due to be granted as to this claim.

### B. There Has Been No Breach of Fiduciary Duty

For the same reasons the plaintiffs' fraud claims relating to statements regarding benefits cannot be maintained, there has been no breach of any purported fiduciary duty.  In *Ames*, the court concluded that even if the selling company was a fiduciary with respect to the purchasing company's benefit plans, there was no breach of fiduciary duty.  The *Ames* court distinguished the Supreme Court's decision in *Varity* for the same reasons *Varity* is not applicable to this case, stating:

> . . . *Varity Corp.* is factually distinguishable on important grounds.  First, there was ample evidence Varity Corporation deliberately misled plaintiffs.  For instance, there was evidence the transfer was part of a plan for consolidating a subsidiary's money-losing division in a new corporation, and that Varity thereby hoped to rid itself of benefit payment obligations to the employees of the failing divisions.  *Id.* at 1068.  Despite Varity's representations of the rosy financial outlook for its new subsidiary, the corporation was insolvent from the day of its creation.  *Id.* at 1069.  . . . Varity Corporation took significant steps to falsely assure plaintiffs of facts it knew to be untrue: transferring would not undermine the security of their employee benefits.
>
> There is no evidence defendants had any guilty knowledge about the financial security of Silgan's benefits or made any demonstrably false comparisons between ANC's benefits and Silgan's benefits.  Rather, defendants made the following carefully qualified conclusion about Silgan's benefits: "I am pleased Silgan has agreed to offer compensation opportunity and employee benefits that are similar to those you currently have at ANC.  The programs are not identical and individuals may be affected in various ways, but in the aggregate, the total value of the programs of the two companies is very comparable."  These statements are in the manner of general expressions of opinion, not actionable statements of material fact. . . .
>
> In addition, any comparisons ANC made between its benefit plans and those of Silgan were immaterial because plaintiffs have not been deprived of any vested benefits. . . .  [T]here is no evidence that the benefits plaintiffs claim in this

action were anything other than contingent.  Thus, even assuming plaintiffs
provided solid factual support for their contention Silgan benefits are not in fact
comparable, defendants breached no fiduciary duty.

*Ames*, 1997 WL 733893 at *15.

In *Coleman*, the court also concluded that there was no breach of any fiduciary duty,

because the selling company was free to terminate the plaintiffs' employment and their benefits at

any time.  The court reasoned as follows:

> Plaintiffs assert that 3M [selling company] misrepresented the benefits
> available under the GE [buyer's] plan and misrepresented comparisons between the
> two plans.  Plaintiffs assert that 3M was in a position of superior knowledge and
> that this coupled with its fiduciary duty to the plaintiffs is sufficient to state a cause
> of action.  This inquiry turns on whether, assuming the facts as presented by the
> plaintiff are true, it makes any difference.  Since 3M was free to terminate the
> employees at the completion of its sale of the going concern, and since the benefits
> at issue were contingent, any misrepresentation is immaterial because the plaintiffs
> have not been damaged in any manner.  As to defendant 3M, the careers of the
> plaintiffs were over and they could either accept employment at GE or enter into
> the marketplace as unemployed individuals.

*Coleman*, 643 F. Supp. at 1238-39.  *See also Flanigan v. General Electric Co.,* 242 F.3d 78 (3d

Cir. 2001) (selling company who stated that employees' benefits with the purchasing company

would  be "substantially similar" or "essentially equal" to the benefits with selling company did

not breach any fiduciary duty because there was no evidence that it withheld material information

or purposefully misled the plaintiffs in any way).

The cases discussed above are sufficiently similar to the present matter.  In this case,

SCES was free to terminate the plaintiffs' employment and benefits at any time.  In addition, there

is insufficient evidence that SCES, specifically Sherrill, intended to mislead the plaintiffs

regarding the benefits at Pro One when he made the June 2000 statement and the November 2000

statement.  Sherrill drafted the proposed Asset Purchase Agreement to state that the prospective

purchaser would employ PowerCall employees on substantially similar terms as such employees are employed by SCES.  (Sherrill Decl., ¶ 20, Ex. D).  Pro One agreed to this "substantially similar" commitment when it submitted its bid and Pro One's proposal stated that the average percentage of Pro One's benefits to salary was approximately 34% compared to 37% for PowerCall.  (Sherrill Decl., ¶ 21, Ex. E).  Sherrill relied upon these two statements in making his recommendation to sell PowerCall's assets to Pro One.  (Sherrill Decl., ¶ 22).  Moreover, on November 6, 2000, just a day before Sherrill's November 7, 2000, meeting with PowerCall employees, Sherrill received an e-mail from Pro One that stated Pro One would compensate PowerCall employees for the difference in the value of their current benefits through a base compensation adjustment.[69]  (Sherrill Decl., ¶ 24, Ex. G).  Consequently, Sherrill's November 2000 statement regarding Pro One's benefits was based on the information provided to him by Pro One.  Even if this information was inaccurate, it does not demonstrate that Sherrill intended to deceive the plaintiffs concerning the benefits.  Therefore, summary judgment is due to be entered on the plaintiffs' fiduciary duty claims.

## VI.  COUNT V:  BREACH OF CONTRACT - YEAR END BONUS

In Count V of the Second Amended Complaint, the plaintiffs (with the exception of Childers and Robertson) assert a breach of contract claim relating to a year-end bonus "upon retirement."  The plaintiffs have once again failed to respond to the defendants' motion for summary judgment on this claim.  As such, summary judgment is due to be granted on Count V of the plaintiffs' second amended complaint.

---

[69] This evidence is not refuted by the plaintiffs.

## VII.  COUNT VI: BREACH OF CONTRACT - RICKELS' COMMISSION CLAIM

In Count VI, plaintiff Rickels asserts a breach of contract claim in which he alleges that he is owed certain commissions relating to sales of commercial security systems.  Rickels was employed as a commercial salesman.  (Rickels Dep., p. 51).  The undisputed evidence shows that all PowerCall salesmen were compensated pursuant to a commission plan entitled, "PowerCall Security 2000 Compensation Plans."  (Roberts Decl., ¶ 19, Ex. F (DX 6); Rickels Dep., pp. 65-67, 317).  Upon the sale of a commercial security system, salesmen were paid one-half of their commission rate.  The commission rate for the sales of commercial security systems varied between 4% and 10% depending on the profit margin involved in the particular sale.  When the project was completed or closed, the salesman would be paid the remaining unpaid portion of the commission.  (Rickels Dep., p. 129; Roberts Decl., Ex. F (DX 6), pp. 5-6).

In the event of termination of employment, the commission plan provides the following with respect to unpaid commissions:

> Participants who retire, die or become totally and permanently disabled, or who transfer to a position outside PowerCall, including other positions within Southern Company will receive commissions of sales earned through the period of active service.
>
> Employees who terminate employment for any reason other than those described above, will forfeit all unpaid awards.

(Roberts Decl., Ex. F (DX 6), p. 4).  While Rickels argues that he performed all of the services necessary to sell the security systems (doc. 108 at 1-2), and as such, is entitled to the full commissions from the defendant, SCES argues that at the time of the sale of the assets of PowerCall, several security projects were not closed or completed.  Most of these projects were sold to Pro One and thus Pro One assumed responsibility for paying any remaining commissions.

64

(Roberts Decl., ¶ 21).

Rickels' commission claim is based on seven jobs or projects he sold. (Rickels Dep., pp. 104-05, 124-45, 279-80). Rickels contends that he should have been paid commissions by PowerCall for jobs that were not completed at the time of the sale of PowerCall's assets to Pro One. (Doc. 108 at 1-2; Rickels Dep., p. 123). However, SCES argues that because Rickels' employment with SCES ended on December 1, 2000, and, therefore, under the commission plan he is not owed further commissions for jobs that were completed after December 1, 2000.

Rickels does not offer any evidence that would tend to establish that he had any agreement with SCES other than that set out in the compensation plan. The clear language of the plan and Rickels' own testimony establish that salesmen were paid one half of their commissions at the time of sale and the remaining commissions when the project was completed or closed. Moreover, the addendum to Protection One's offer of employment letter clearly states that Protection One will continue the same commission plan as described by PowerCall on new and existing accounts. Of the seven jobs that Rickels claims he is owed commissions for, five were not complete at the time that PowerCall was sold to Protection One and Rickels was paid all of the commissions owed to him on the other two.

Rickels does not dispute that the projects weren't complete at the time of the sale, and were thus, assumed by Protection One. Instead, he contends that he does not have a contractual relationship with Protection One and that the compensation plan merely establishes a timing mechanism for payment of commissions. (Doc. 108 at 1-2). However, he fails to offer any legal authority for such an assertion. (*Id*.). Further, Rickels contends, "In some instances, when there was corporate approval at the every [sic] top, a salesman like Rickels is entitled to the full

65

commission at the time of the sale." (*Id.* (citing Rickels dep. at 49-50, 66-75, 102-15, 120-40).

However, Rickels' own self-serving testimony is insufficient to overcome the clear compensation

plan language.

Alabama law is clear that "where a contract provides that the employee will be paid

commissions . . . he is entitled to the agreed upon compensation on those orders which he

procured or negotiated, even though his services were terminated before the contract or sale is

completed by performance, unless he is precluded by the express terms of the contract." *James A.*

*Head & Co., Inc. v. Rolling*, 90 So. 2d  828, 837 (Ala. 1956) (emphasis added).  In *Oates v. Lee*,

133 So. 44 (Ala. 1931), the Alabama Supreme Court applied this standard in a factually similar

case.  The plaintiff therein was employed by the defendant on a commission basis.  The plaintiff's

contract authorized the defendant to discharge him at any time and provided that the plaintiff

would not be entitled to any commissions for or upon orders or sales not completed and fully

delivered.  Following his discharge, the plaintiff sought to recover a commission on a sale he

made prior to his discharge, but where delivery did not occur until after his discharge.  The court

held that "[w]here the language is unambiguous, and but one reasonable construction of the

contract is possible, the court must expound it as made between the parties."  In such a case, there

is simply "nothing for the court to construe" and the "contract is to be enforced, however onerous

it may be."  *Id.*, 133 So. at 45.

As already stated, the compensation plan that governs SCES's payment of commissions

provided that PowerCall salesman were paid one-half the commission at the time of sale, and the

remaining half at the time the job was completed.  The compensation plan also unambiguously

states that employees who terminate employment for any reason (other than a few excepted

66

situations not applicable here) will forfeit all unpaid awards.  (Roberts Decl., Ex. F (DX6), p. 4).

It is undisputed that the only commissions Rickels had not yet received at the time of his

termination were for jobs which had not been completed.  As the commissions for these jobs were

not due until PowerCall completed the jobs, Rickels forfeited these commissions at the time of his

termination.  The language in the compensation plan is unambiguous.  Therefore, no matter how

onerous Rickels might argue the compensation plan is, there is nothing for the court to construe.

Accordingly, there is no need for the court to determine whether SCES "can lawfully transfer its

obligations" because no such obligations existed once Rickels' employment terminated.  For this

reason, as well as the other reasons stated in the defendants' Summary Judgment Brief, Rickels'

claim in Count VI is due to be dismissed.

## VIII.  COUNTS VIII THROUGH XII -RACE DISCRIMINATION CLAIMS

In their response briefs, the plaintiffs' failed to respond to the defendant' arguments that

summary judgment is due to be entered on the race discrimination claims of certain of the

plaintiffs (Cassandra McClinton (Count VIII & IX), Russell Hardy (Counts X & XI), and Sean

Maldon (Count XII)).  As previously noted, party may not rely on his pleadings to avoid judgment

against him.  *Resolution Trust Corp.*, 43 F.3d at 599.  As the plaintiffs have abandoned Counts

VIII through XII, summary judgment is due to be granted on these claims.[70]

---

[70] In the plaintiffs' contract brief discussing plaintiff McClinton, she states,

   During my employment with Powercall, I was subjected to race discrimination with respect to my pay and the denial of a promotion. For example, Charlotte Henley, a Scheduler/Project Specialist II, received a bonus that was based upon a higher percentage than the bonus I received, even though she was in a lower position and had less experience with the company. Ms. Henley did not possess certain qualifications that I possessed, including knowledge of Oracle and CSS. The Southern Company discriminated against me on the basis of my race with respect to my bonus.

(Pl. Contract Brief at 50-51).  Her supplemental interrogatory answers also state as follows:

(continued...)

# CONCLUSION

The record on the motion for summary judgment consists of numerous briefs and volumes of evidentiary submissions. Premised upon a review of these materials and on the foregoing analysis, the court finds that the defendants' motion for summary judgment is due to be granted in its entirety.[71] An order in accordance with the court's findings will be entered contemporaneously herewith.

**DONE**, this _14th_ day of February, 2004.

_/s/ J. Ott_
**JOHN E. OTT**
United States Magistrate Judge

---

[70](...continued)

> The Southern Company also discriminated against me on the basis of my race when it denied my application for Acting Area Manager in favor of a white male, Tyndall Chapman in October 2000. Mr. Chapman was less qualified for the position than me. I believe I was denied the promotion because of my race.

(Pl. First Evid. Submission (doc. 103), Ex. 10, p. 5).

Even if these terse references were deemed a sufficient response to the motion for summary judgment to avoid the abandonment argument, the defendants' motion is still due to be granted for a number of reasons. First, McClinton has failed to demonstrate that Henley is an appropriate comparator because she and the plaintiff held different positions, which involved different duties, and they were supervised and evaluated by different individuals. Second, the plaintiff has failed to show that her bonus compensation was less than Henley. Third, she has failed to offer any evidence that SCES's reasons for any alleged difference in bonuses is pretextual. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.), cert. denied, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) ("the plaintiff [must] demonstrate[] 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence'"). Her second claim, that she should have received the Acting Area Manager position, is similarly due to be dismissed because she has not demonstrated that she was qualified for the position or that SCES's reasons for selecting Chapman were pretextual. The plaintiff's self-serving assertion that "Chapman was less qualified for the position than [she was]" is insufficient to call into question the other evidence including that Chapman was a manager and McClinton was not. Additionally, McClinton did not show that she had the sales, installation, and service experience needed to fill the position for the month until the sale of PowerCall was complete.

The remaining plaintiffs' race claims were not addressed at all in their responses. Even if they were, those plaintiff are similarly not entitled to any relief. Hardy and Maldon's claims (Counts X, XI & XII) are either time barred or without evidentiary foundation.

[71] The plaintiffs also presented a letter submission to the court in December 2003. It does not appear to have been served on the defendants. Additionally, many items therein are not in a form that may be considered by the court, and, in many instances, are redundant with the record submissions. Accordingly, the items have not been considered by the court. To the extent the plaintiffs complain about their former counsel, that is not a matter for disposition in this proceeding at this juncture.